**IN THE UNITED STATS DISTRICT COURT**
**DISTRICT OF COLUMBIA**

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road, #15-287
Boca Raton, FL, 33433

Plaintiff,

v.

HAMILTON FOX, in his individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

And

ELIZABETH HERMAN, in her individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

And

H. CLAY SMITH, III, in his individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

And

JULIA PORTER, in her individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

And

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street NW
Building A, Suite 117
Washington, DC, 20001

Defendants.

Case No.:

**COMPLAINT**

## I.      INTRODUCTION

1.      Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), and Julia Porter ("Defendant Porter") (collectively "Defendants"). The Individual Defendants are all employed by the District of Columbia Office of Disciplinary Counsel ("ODC") which "serves as the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar."[1] Defendant Fox, Defendant Herman, Defendant Smith, and Defendant Porter, while acting in concert in a conspiracy under the "color" of state law, are being sued for actions taken in their individual capacities and outside the scope of their official duties. ODC is being sued in its official capacity. Defendants, acting in concert and as joint tortfeasors, intentionally violated Mr. Klayman's statutory, constitutional and other rights due to Mr. Klayman's political beliefs, public interest activism, and gender, pursuant to their own individual biases, prejudices, political views, loyalties, and allegiances.

## II.     JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction).

3.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4.      This Court has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367.

---

[1] https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/obcmission.cfm

5.      Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) in that Defendants reside here and are subject to personal jurisdiction in this District. Venue is proper in the District of Columbia because the Individual Defendants are all employed by the District of Columbia Office of Disciplinary Counsel, and the conduct complained herein arises out of Defendants' unconstitutional and illegal conduct as ODC attorneys.

## III.    PARTIES

6.      Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

7.      Defendant Hamilton Fox is an individual, a natural person. Defendant Fox is at all relevant times a citizen and resident of the District of Columbia.

8.      Defendant Elizabeth Herman is an individual, a natural person. Defendant Herman is at all relevant times a citizen and resident of the District of Columbia.

9.      Defendant H. Clay Smith III is an individual, a natural person. Defendant Smith is at all relevant times a citizen and resident of the District of Columbia.

10.     Defendant Julia Porter is an individual, a natural person. Defendant Porter is at all relevant times a citizen and resident of the District of Columbia.

11.     Defendant Office of Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

///

///

///

## IV. STANDING

12. Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants.

## V. FACTS

***Facts Pertaining to Mr. Klayman's Representation of Ms. Sataki***

13. Mr. Klayman is an attorney licensed to practice law in the District of Columbia, who has been a member continuously in good standing since 1980 and with no current disciplinary record.

14. On November 2, 2010, about eight years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

15. The Sataki Complaint was implemented as the result of two separate complaints, both prepared and filed by non-lawyers on behalf Elham Sataki ("Ms. Sataki"), engaging in the unauthorized practice of law then and at all material times thereafter.

16. Ms. Sataki has refused to identify who filed the first complaint on her behalf. The second complaint was prepared and filed by either Kathleen Staunton or Sam Razzazi, her cousin, who uses many aliases and is a convicted felon.

17. The Sataki Complaint was based on Mr. Klayman's representation of Ms. Sataki's interests in a sexual harassment action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C).

18. The scope of Mr. Klayman's services, performed along with Ms. Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, the filing of

an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Ms. Sataki's behalf, engaging in approved publicity by Ms. Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

19.     The VOA Lawsuit, which was also filed with Ms. Sataki's knowledge and consent, and which sought to ask the District Court to put Ms. Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

20.     Furthermore, the EEO/OCR administrative complaint was ultimately not successful.

21.     Prior to and during the course of Mr. Klayman's representation of Ms. Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

22.     At the time, Mr. Klayman sympathized with Ms. Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Ms. Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Ms. Sataki's behalf, pro bono.

23.     As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Ms. Sataki on a personal level, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding

psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

24.     Ms. Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

25.     Specifically, as a "final straw," Ms. Sataki's request that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Ms. Sataki. Mr. Klayman thus suggested that it would be best if Ms. Sataki found new counsel to represent her in her claims against VOA.

26.     Mr. Klayman even referred Ms. Sataki to his personal friend, Gloria Allred, Esq., a famous women's rights legal advocate, as well as Tim Shea, Esq., who had come suggested by Mr. Shamble.

27.     When Ms. Sataki's complaints against VOA did not yield immediate results, Ms. Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

28.     Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement.

29.     This never occurred because a series of events ultimately resulted in Mr. Klayman no longer representing Ms. Sataki.

30.     Mr. Klayman and Mr. Shamble were unable to reach Ms. Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Ms. Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Ms. Sataki's right of appeal was protected and not lost.

31. At the end of the day, Ms. Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a pro bono basis.

***Facts Pertaining to Ms. Sataki's Complaint Against Mr. Klayman***

32. On November 2, 2010, nearly eight years ago, persons who are not lawyers anonymously filed ODC complaints against Mr. Klayman purportedly on Ms. Sataki's behalf – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

33. These non-lawyers also filed corresponding identical complaints with The Florida Bar and the Pennsylvania Bar, both of which were summarily dismissed because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

34. Nevertheless, ODC sent Ms. Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

35. Afterwards, Ms. Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence and admissions. However, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Ms. Sataki's complaint six years later, as set forth in detail in the following paragraphs. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to defend himself. In addition, during this interim time period, relevant documents were lost, witnesses moved, and memories faded.

36. On January 15, 2014, ODC Counsel H. Clay Smith III ("Defendant Smith") sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Ms. Sataki] that has dropped off the map…She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

37. ODC then, about seven years after the complaints were purportedly filed by Ms. Sataki, filed a Specification of Charges with the District of Columbia Board of Professional Responsibility without providing Mr. Klayman proper notice, or granting a meeting as requested with the new Disciplinary Bar Counsel Hamilton Fox ("Defendant Fox"), in contravention of ODC's policy and practice and Mr. Klayman's due process and other constitutional and statutory, and legal common law rights, which had already been compromised during the previous seven years of unconscionable and highly prejudicial delay.

38. A draft of the Specification of Charges were prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidences ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepts norms concerning statutes of limitations, laches, and other laws.

***Facts Pertaining to ODC Misconduct***

39. The Individual Defendants, acting in concert as joint tortfeasors, each and every one of them, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, but which the abuse of authority is not, to act outside the scope of their official duties and intentionally violate Mr. Klayman's constitutional and other rights by selectively prosecuting Mr. Klayman because of his political activism, free speech, and gender, as set forth in more detail below.

40.     ODC has also engaged in a pattern and practice of abusing and exceeding its position of authority, which is granted under state law, but which the abuse of authority is not, to act outside the scope of their official duties and intentionally violate Mr. Klayman's constitutional and other rights by selectively prosecuting Mr. Klayman because of his political activism, free speech, and gender.

41.     Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a court rule that former President Bill Clinton had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights.

42.     Even a quick search of FEC records shows that Defendant Fox, as well as Deputy Bar Disciplinary Counsel Elizabeth Herman ("Defendant Herman") both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats.

43.     It is clear that Defendants' goal is to prevent Mr. Klayman from being able to practice law because they do not agree with his political and other beliefs, and in retaliation for his gender during this highly charged period when men are frequently presumed guilty of even provably false allegations.

44.     Because of his conservative beliefs, Defendants Herman and Porter, who are both Deputy Bar Disciplinary Counsel, in particular, apparently see Mr. Klayman as anti-women, all of which is not true. It was apparent to Mr. Klayman Defendants Herman and Porter in particular wanted to take disciplinary action against Mr. Klayman due to his gender and activism, and thus enlisted the other Defendants, including the new Bar Disciplinary Counsel, Defendant Fox, to follow suit and work in concert with them.

45.     After many years, Defendants have improperly, unethically, illegally, and suddenly revived the Sataki Complaint for purely tactical and strategic reasons, despite the fact that the original complainant, Ms. Sataki, had abandoned it.

46.     Indeed, the tactical purpose for the sudden, unexplained, and unwarranted revival of the Sataki Complaint, after 8 years of delay and after two other state bars summarily and timely dismissing identical complaints – Pennsylvania and Florida — hinges on a hearing committee's remedial recommendation with regard to another pending ethics complaint against Mr. Klayman, Bar Docket No. 2008 D048 ("the Judicial Watch Complaint") that Mr. Klayman must, after serving his proposed three-month suspension, then petition for reinstatement based on the fitness to practice law.

47.     Thus, if Defendants can "pile on" by filing a new case or cases before the Board, as they have done with regard to the Sataki Complaint, they can argue that this on-going proceeding, which would go on for years, would be grounds for Mr. Klayman not to be

reinstated, effectively disbarring him, especially since he is now almost 67 years old – in effecting involuntarily retiring of Mr. Klayman. This piling on is also intended to bankrupt Mr. Klayman, as he has already expended considerable monies in defense of the Judicial Watch matter. Thus, regardless of Defendants' chances of success in the Sataki case, Defendants can seek to silence Mr. Klayman just by driving him into financial ruin. Other recent threats of an additional bar proceeding, forwarded by Defendant Porter on her own behalf and on behalf of the other Defendants, acting in concert, which would serve to have Mr. Klayman spend considerable monies he cannot afford, have also been levied by Defendants

48.     The dishonesty of the Individual Defendants and the fact that the sudden revival of the Sataki Complaint is nothing more than an unethical, unprofessional, unconstitutional and illegal tactical strategy is strongly evidenced by ODC's filing of a frivolous assignment of error to the Board's decision to remove the reinstatement provision in the Judicial Watch Complaint.

49.     Indeed, the reason that the Board reversed its decision and removed the reinstatement provision in the Judicial Watch matter is that it it found that Mr. Klayman had been honest in stating that he had received what in effect was advice of counsel for the acts that he had been charged with. ODC never argued for or challenged this finding at the time, yet still dishonestly, opportunistically and unethically filed an assignment of error after the fact.

50.     Defendant Smith told Mr. Klayman that he was relieved that the reinstatement provision was removed, as he "didn't think it was right." However, he said the filing of the assignment of error was "out of his hands" and belonged to the other Defendants.

51.     The Individual Defendants have not hidden, or even attempted to hide their deep-seated resentment and bias and animus towards Mr. Klayman due to his political beliefs, activism, free speech, and gender

52.     Confirming and thus supporting the fact that Mr. Klayman is being selectively, unethically, unconstitutionally, and illegally prosecuted for his politics, activism, free speech, and gender, is the extremely hostile and disrespectful demeanor and words Defendant Herman exhibited during a meeting that occurred on July 28, 2017 and at other times, which exhibited bias and discrimination as well, based on his public advocacy, free speech, and gender.

53.     Defendant Herman abruptly and in a hostile voice refused to say whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his [male] business."

54.     Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

55.     It is indisputable that Defendant Herman's personal feelings should have no impact on the performance of her professional duties, but her open admission clearly shows that she is driven by her bias and animus due to Mr. Klayman's political beliefs, activism, free speech, and gender.

56.     Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

57.     This gender-based and political vendetta against Mr. Klayman is clearly demonstrated and confirmed in a meeting that that Mr. Klayman had with Defendant Smith on September 29, 2017.

58. The purpose of this meeting was to discuss another vindictive Complaint filed by Mr. Fitton, president of Judicial Watch, as well as the pending Sataki matter.[2] Defendant Smith strangely suggested that rather than appeal the hearing committee's findings with regard to the first Fitton/Judicial Watch Complaint alleging conflicts of interest to the Board, that he simply agree to resign from the bar, which is in effect, disbarment.

59. Mr. Fitton's retaliatory vindictiveness stems from Mr. Klayman having previously obtained a jury verdict against Judicial Watch for malicious defamation, which Mr. Fitton as President of Judicial Watch caused and furthered, and which award included punitive damages.[3]

60. Defendant Smith then stated that if Mr. Klayman would agree to this, it could be done quietly and that no one else would know, preventing embarrassment to and bad publicity for Mr. Klayman, suggesting that the Defendants would otherwise seek to smear and thus harm Mr. Klayman publically by destroying his professional and personal reputation. This obviously is not only a false premise, and contrary to the remedies that had been previously recommended to the hearing committee by ODC, which fell well short of what was in effect, disbarment.

61. However, apparently seeing that the hearing committee was recommending three months' suspension with a requirement of petitioning for reinstatement based on a showing of the fitness to practice law, Defendants – acting in concert through Defendant Smith - now outrageously, without factual or legal basis, suggested that resignation would be the easier and less humiliating road for Mr. Klayman to agree to.

62. Mr. Klayman was confused at the time as to why Defendant Smith would made

[2] Indeed, it is no coincidence that an attorney of Judicial Watch, James Peterson, has been present at the Sataki hearing, which commenced on May 30, 2018, and has been taking notes to further Mr. Fitton's damaging smear campaign against Mr. Klayman. Mr. Fitton and Judicial Watch were obviously tipped off by Defendants, acting in concert with Mr. Fitton, to damage Mr. Klayman further through false publicity and other unethical, illegal, and improper means.

[3] *Klayman v. Judicial Watch*, 13-cv-20610 (S.D. Fla.).

such a strange and outrageous suggestion, but in retrospect Mr. Klayman has reason to believe, based on the facts pled herein, that it was a warning to Mr. Klayman that there was a concerted effort by his superiors at ODC, including but not limited to Defendants Fox, Herman, and Porter, to remove him from the practice of law and that this was beyond his control, which has now been clearly demonstrated in the Individual Defendants' actions, acting in concert.

63.    Mr. Klayman asserts that even though Defendant Smith is simply and pliantly following the orders of his superiors, Defendants Fox, Herman, and Porter, he is still equally liable and thus culpable, as all of the Defendants are acting in concert.

64.    In that regard, ODC recently even transferred the most recent Fitton Complaint from Defendant Smith to Defendant Porter, obviously because ODC did not want anyone who may be sympathetic to Mr. Klayman to handle the matter. She then, confirming her complicity, threatened Mr. Klayman with another bar proceeding, claiming to have even prepared a draft specification of charges before Mr. Klayman could even respond to this threat.

65.    Even more, as set forth above, Defendants would not allow Mr. Klayman the courtesy of a meeting with Defendant Fox before rushing to file a Specification of Charges with the Board in the Sataki matter.

66.    This refusal to allow a meeting is also due to the conflict of interest that Defendant Fox claimed to have suffered, for which Defendant Fox was trying to hide.

67.    Indeed, while it was clear that Defendant Fox had been involved in the so-called investigation and prosecution of Mr. Klayman from the very outset, he disingenuously and defensively demanded that Mr. Klayman sign a conflict of interest waiver before finally agreeing to a meeting with him and Mr. Klayman after the Specification of Charges had already been filed before the Board.

68.     The conflict of interest – which Defendant Fox clearly recognized and admitted –
stems from the fact that Defendant Fox, while previously a lawyer and partner at Sutherland,
Asbill and Brennan, represented Mr. Klayman's interests when he defended a deposition of his
then partner, Herbert Beller, concerning a severance agreement he negotiated for Mr. Klayman,
noticed by Judicial Watch, the public interest group which Mr. Klayman founded in 1994, and
which through its president Tom Fitton, had, as retaliation, vindictively complained against Mr.
Klayman in the pending matter now before the District of Columbia Court of Appeals.

69.     During a May 11, 2018 meeting to discuss the Sataki Specification of Charges,
and the gross prosecutorial misconduct of the Defendants up to that point, for which Mr.
Klayman had substantial hard evidence, Defendant Fox acted extremely hostile towards Mr.
Klayman, further confirming the bias and animus against Mr. Klayman due to his political
beliefs, activism, speech, and gender.

70.     Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel Julia
Porter ("Defendant Porter") and ODC's described investigator, Kevin O'Connor would be
present in the meeting, which had not been disclosed previously.

71.     From the outset, Defendant Fox immediately and belligerently stated that he was
not going to hear anything about or discuss dismissal of the Specification of Charges, but that
Mr. Klayman could simply produce the evidence of misconduct and unethical and illegal
behavior.

72.     Mr. Klayman calmly responded that he would not be dictated to as to what he
could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting
is over" and that Mr. Klayman "should leave [his] office."

73.     When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to file this instant Complaint, as well as bar grievances which are attached hereto as *Exhibit 1* and are incorporated herein by reference.

74.     Defendant Fox then approached Mr. Klayman at the door, as if to stalk him and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

75.     This more than confirms Defendants' improper motivations, that the mission of Defendants is to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

76.     Indeed, it is clear that Mr. Klayman is being selectively prosecuted by Defendants based on politics, activism, free speech, and gender.

77.     It was even revealed that Defendants purposefully and intentionally withheld exculpatory documents and evidence when they had a duty to turn them over to Mr. Klayman.

78.     As another example, ODC quickly, improperly, and unethically disposed of a valid and meritorious Complaint filed by Mr. Klayman against Paul Orfanedes ("Mr. Orfanedes"), Judicial Watch's litigation director, centered around Mr. Orfanedes' participation in a misappropriation of 1.4 million dollars of donor money.

79.     In fact, Defendant Herman admitted that this Complaint was summarily dismissed, less than a month after it was received, and it was never even processed or opened for a full investigation, despite the uncontroverted fact that Mr. Orfanedes, a member of the bar, had participated in the outright theft of 1.4 million dollars of donor money over 15 years.

80.     On the other hand, the clearly non-meritorious Sataki Complaint, which not based in law or fact (which has been demonstrated to Defendants through sworn affidavits and the summary dismissal of the Florida and Pennsylvania ones), has been pending against Mr. Klayman for now about eight years, a condition that would not be permitted in other jurisdictions and should not be countenanced in this one, due to ordinary norms of laches, statute of limitations, fundamental fairness, much more due process and equal protection under the Constitution.

81.     This striking dichotomy is clear evidence of unconstitutional and illegal selective prosecution, bias, and personal animus that must be remedied.

82.     As a result of Defendants' prosecutorial misconduct, Mr. Klayman has been damaged by his having to expend significant time and resources defending himself against this baseless prosecution, including but not limited to attorney's fees, costs, travel and other expenses, as well as personal and professional time lost preparing for his own defense. It has also damaged Mr. Klayman by intentionally causing him severe emotional distress. Defendants' prosecutorial misconduct has been carefully and cynically calculated to bankrupt Mr. Klayman, so that he is no longer able to practice law or engage in his public interest advocacy, which Defendants do not agree with and despise. Defendants intent is to smear Mr. Klayman and fatally damage his personal and professional reputations, affecting his family and livelihood, which damage has already occurred and is continuing.

83.     *See, e.g., Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373

(1976)). Irreparable injury is present with regard to Defendants' unconstitutional conduct toward Mr. Klayman, which has severely damages him and is continuing to severely damage him

84.     Indeed, it is no coincidence that an attorney of Judicial Watch, James Peterson, has been present at the Sataki hearing, which commenced on May 30, 2018 and ended on June 27, 2018, and later another Judicial Watch attorney, Michael Bekesha, had been taking notes to further Mr. Fitton's damaging smear campaign against Mr. Klayman. Mr. Fitton and Judicial Watch were obviously tipped off by Defendants, acting in concert with Mr. Fitton, to damage Mr. Klayman further through false publicity and other improper means.

85.     Mr. Klayman thus filed ethical complaints with ODC setting forth the gross misconduct by the Defendants specified above, which facts are incorporated herein by reference. *Exhibit 1*.

86.     On June 5, 2018 and thereafter, the chair of the Board of Professional Responsibility, Robert C. Bernius, incredibly informed Mr. Klayman that the Board will not pursue any remedial action, much less open an internal investigation of the alleged prosecutorial misconduct and violation of ethics, the law, and the Constitution. Mr. Klayman has also asked the District of Columbia Bar's general counsel, president, and chief executive officer, Marlon Paz, Esther Lim, and Robert Spanoletti, respectively, to review the unethical, unconstitutional, and illegal conduct set forth in *Exhibit 1*, and they have failed to take action in furtherance of this apparent "cover up" to protect their own, with a "circle the wagons" mentality, motivation, and practice. *Exhibit 2*.

87.     Defendants and the Board of Professional Responsibility are not, and cannot be, above ethics, the law, much more the Constitution. Mr. Klayman therefore has no recourse but to file this instant Complaint, as he has no legal or other remedies remaining.

88.     As further evidence of ODC and the District of Columbia Bar's political biases and motivations to chill free speech and other constitutional rights by conservatives, and those they wrongfully perceive to be anti-feminist and anti-women as a result, ODC and the other Defendants are entertaining, if not soliciting, completely meritless complaints against conservative activists and figures.

89.     Attached hereto as *Exhibit 3*, is a Complaint filed by a group of law professors against Counselor to the President of the United States, Kellyanne Conway ("Conway Complaint"), also a member of the bar, seeking to discipline her for her political activities and beliefs, as well as to have a chilling effect on her free speech on behalf of President Donald J. Trump.

90.     Even a law professor from Northwestern University, Steven Lubet, a self described "liberal Democrat," wrote for Slate Magazine, a far left publication, that the Conway Complaint "is dangerously misguided and has the potential to set a terrible precedent.[4]"

91.     One of the signatories to the Conway Complaint, has somehow, perhaps not coincidentally in all likelihood, been placed on the hearing committee that is adjudicating the Sataki Complaint, which at least creates a strong appearance of clearly demonstrating the unconstitutional political biases, gender based discrimination, and intent to silence conservative figures and activists like Mr. Klayman and Ms. Conway.

92.     Indeed, Mr. Klayman himself has been a vocal, strong, and ardent supporter of President Trump, much like his fellow conservative bar member, Ms. Conway, who Mr. Klayman knows quite well. Regrettably, during this polarized and highly charged period of

---

[4] Steven Lubet, *In Defense of Kellyanne Conway*, Slate, Feb. 27, 2017, available at: http://www.slate.com/articles/news_and_politics/jurisprudence/2017/02/the_misconduct_complaint_against_kellyanne_conway_is_dangerously_misguided.html

American history, anyone who supports President Trump is generally considered and treated as "enemies" of liberal and Democrat activism and causes, as the President has been branded a female abuser, sexist, misogynist, and last but hardly least, a racist. This bias and thus mindset is clearly present with regard to the Defendants herein, several of whom have donated to politicians and political candidates who support these causes and who oppose and have vilified the President publically.

93. Finally, at the hearing in the Sataki matter, Defendants, acting in concert, by and through Defendant Smith, openly admitted that their motivation in prosecuting bar complaints against Mr. Klayman is because he had filed large and complex lawsuits against Hillary Clinton, other Democrats, and other related parties, persons, and entities.

**FIRST CAUSE OF ACTION**
***Abuse of Process***
**Against All Defendants**

94. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

95. Defendants, each and every one of them acting in concert, have abused and perverted the Board of Professional Responsibility's process in initiating, furthering, and falsely deciding claims of misconduct in order to compel Mr. Klayman to be prevented and ultimately barred from practicing law due to Mr. Klayman's political beliefs, activism, free speech, and gender.

96. As set forth previously, this concerted effort to disbar Mr. Klayman is evidenced by Defendant Smith's ridiculous and outrageous suggestion, on behalf of the other Defendants, that he accept disbarment, despite the fact that the hearing committee had only recommended a three-month suspension in the Judicial Watch matter.

97. Defendants conduct is a deliberate misuse of the Board of Professional Responsibility's judicial process for all of the reasons set forth in this Complaint and its preceding paragraphs, as well as the exhibits hereto.

**SECOND CAUSE OF ACTION**
***Malicious Prosecution***
**Against All Defendants**

98. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

99. Defendants had no reasonable basis in fact or law to file a Specification of Charges with the Board of Professional Responsibility, particularly after seven years if delay and after Ms. Sataki had abandoned her purported complaints, much less the clear and convincing evidence needed to substantiate their claims, yet proceeded to do so anyway due to Mr. Klayman's political beliefs, activism, speech, and gender.

100. This is strongly evidenced by the fact that The Florida Bar and the Pennsylvania Bar both summarily dismissed identical claims filed on behalf of Ms. Sataki against Mr. Klayman because they were not based on fact or law.

101. Defendant Herman, however, on behalf of herself and the other Defendants, acting in concert, "could care less" that these other Bars clearly and summarily found no misconduct, because their unethical, illegal, and unconstitutional agenda is to remove Mr. Klayman from the practice of law.

102. Defendants acted maliciously in prosecuting Mr. Klayman, without probable cause, due solely to due to Mr. Klayman's political beliefs, activism, free speech, and gender.

**THIRD CAUSE OF ACTION**
***42 U.S.C. 1983 - Violation of Fourteenth Amendment Equal Protection***
**Against Defendants Fox, Herman, Smith, and Porter**

103. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits attached to this Complaint, with the same force and effect, as if fully set forth herein again at length.

104. The Individual Defendants, as attorneys employed by ODC, the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar, at all relevant times were acting in concert under the color of state law.

105. The Individual Defendants, acting in concert and conspiring in their individual capacities, outside of the scope of their official duties, conspired to violate Mr. Klayman's constitutional, statutory, and other common law rights, and did in fact violate those rights.

106. Intentionally violating an individual's constitutional rights is not within the scope of the Individual Defendants' official duties.

107. The Fourteenth Amendment to the Constitution prohibits states from denying any person within its territory equal protection of the laws.

108. Under the color of state law, the Individual Defendants have deprived Mr. Klayman of his federal, constitutional right to equal protection under the laws by selectively prosecuting him for his gender, public interest advocacy, and free speech without a legitimate or any basis in fact or law.

**FOURTH CAUSE OF ACTION**
***42 U.S. C. 1983 - Violation of First Amendment Protections***
**Against Defendants Fox, Herman, Smith, and Porter**

109. Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits attached to this Complaint, with the same force and effect, as if fully set forth herein again at length.

110. The Individual Defendants as attorneys employed by ODC, the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar, at all relevant times were acting in concert under the color of state law.

111. The Individual Defendants, acting in concert in their individual capacities, outside of the scope of their official duties, conspired to violate Mr. Klayman's constitutional, statutory, and other rights, and did in fact violate those rights.

112. Intentionally violating an individual's constitutional rights is not within the scope of the Individual Defendants' official duties.

113. The First Amendment to the Constitution prohibits states and state entities and agencies from abridging freedom of speech.

114. Under the color of state law, the Individual Defendants have deprived Mr. Klayman of his federal, constitutional right to freedom of speech by selectively prosecuting him without any basis in fact or law to remove him from the practice of law due to his politics, conservative activism, free speech, and gender.

115. The Individual Defendants, acting in concert, are trying to unethically, unconstitutionally, and illegally attempt to disbar Mr. Klayman, so that he is no longer able to pursue his conservative, public interest work, in effect silencing his public interest activism and free speech in furtherance of removing Mr. Klayman from public discourse, as guaranteed by the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Klayman prays for relief and judgment against Defendants as follows: actual, compensatory, and punitive damages in an amount to be determined by the trier of fact, as well as preliminary and permanent injunctive relief, attorney's fees and costs, and any other relief that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: July 3, 2018

Respectfully submitted,

/s/ Larry Klayman

Larry Klayman, Esq.
KLAYMAN LAW GROUP, PA

c/o 7050 W. Palmetto Park Road
#15-287
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5563
*Counsel for Plaintiff*

# EXHIBIT 1



# OFFICE OF DISCIPLINARY COUNSEL

## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501 Fax (202) 638-0862
www.dcattorneydiscipline.org

(*Please print or type*)

Date: May 23, 2018

A. Your Name: (Dr.) (Mr.) (Ms.) (Mrs.) Larry E Klayman
(First) (Initial) (Last)

Address: 2020 Pennsylvania Ave, NW, #800
(Street) (Apt. #)

Washington DC
(City) (State) (Zip)

Business Phone: ______ Home Phone: ______ Cell Phone: 310-595-0800

Email Address: leklayman@gmail.com

(NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

Name: Hamilton Fox
(First) (Initial) (Last)

Address: 515 Fifth Street NW, Building A, Room 117
(Street) (Apt. #)

Washington DC 20(
(City) (State) (Zip)

Telephone No.: 202-638-1501 Attorney's Bar No., if known: ______

C. Have you filed a complaint about this matter anywhere else? ☐ Yes ■ No // If yes, please give details.

D. Do you have a written retainer agreement with the attorney? ☐ Yes ■ No // If yes, please attach a copy.

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.
N/A

F. Do you have other documents that are relevant? ■ Yes ☐ No // If yes, please give details and provide copies.
See attachment with exhibits

**SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE**

G. DETAILS OF COMPLAINT: See attachment with exhibits

**The Undersigned hereby certifies to the Office of Disciplinary Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge.**

SIGNATURE



# OFFICE OF DISCIPLINARY COUNSEL

## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501 Fax (202) 638-0862
www.dcattorneydiscipline.org

(*Please print or type*)

Date: May 23, 2018

A. Your Name: (Dr.) (Mr.) (Ms.) (Mrs.) Larry (First) E (Initial) Klayman (Last)

Address: 2020 Pennsylvania Ave, NW, #800 (Street) (Apt. #)

Washington (City) DC (State) (Zip)

Business Phone: ________ Home Phone: ________ Cell Phone: 310-595-0800

Email Address: leklayman@gmail.com

(NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

Name: Elizabeth (First) (Initial) Herman (Last)

Address: 515 Fifth Street NW, Building A, Room 117 (Street) (Apt. #)

Washington (City) DC (State) 20( (Zip)

Telephone No.: 202-638-1501 Attorney's Bar No., if known: ________

C. Have you filed a complaint about this matter anywhere else? ☐ Yes ■ No // If yes, please give details.

D. Do you have a written retainer agreement with the attorney? ☐ Yes ■ No // If yes, please attach a copy.

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.

N/A

F. Do you have other documents that are relevant? ■ Yes ☐ No // If yes, please give details and provide copies.

See attachment with exhibits

**SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE**

G. DETAILS OF COMPLAINT: See attachment with exhibits

The Undersigned hereby certifies to the Office of Disciplinary Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge.

SIGNATURE



# OFFICE OF DISCIPLINARY COUNSEL

## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501 Fax (202) 638-0862
www.dcattorneydiscipline.org

(*Please print or type*)

Date: May 23, 2018

A. Your Name: (Dr.) (Mr.) (Ms.) (Mrs.) Larry (First) E (Initial) Klayman (Last)

Address: 2020 Pennsylvania Ave, NW, #800 (Street) (Apt. #)

Washington (City) DC (State) (Zip)

Business Phone:________ Home Phone:________ Cell Phone: 310-595-0800

Email Address: leklayman@gmail.com

(NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

Name: Julia (First) (Initial) Porter (Last)

Address: 515 Fifth Street NW, Building A, Room 117 (Street) (Apt. #)

Washington (City) DC (State) 20( (Zip)

Telephone No.: 202-638-1501 Attorney's Bar No., if known: ________

C. Have you filed a complaint about this matter anywhere else? ☐ Yes ■ No // If yes, please give details.

D. Do you have a written retainer agreement with the attorney? ☐ Yes ■ No // If yes, please attach a copy.

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.

N/A

F. Do you have other documents that are relevant? ■ Yes ☐ No // If yes, please give details and provide copies.

See attachment with exhibits

**SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE**

G. DETAILS OF COMPLAINT: See attachment with exhibits

The Undersigned hereby certifies to the Office of Disciplinary Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge.

SIGNATURE



# OFFICE OF DISCIPLINARY COUNSEL

## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501 Fax (202) 638-0862
www.dcattorneydiscipline.org

(*Please print or type*)

Date: May 23, 2018

A. Your Name: (Dr.) (Mr.) (Ms.) (Mrs.) Larry (First) E (Initial) Klayman (Last)

Address: 2020 Pennsylvania Ave, NW, #800 (Street) (Apt. #)

Washington (City) DC (State) (Zip)

Business Phone: ______ Home Phone: ______ Cell Phone: 310-595-0800

Email Address: leklayman@gmail.com

(NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

Name: H. Clay (First) (Initial) Smith III (Last)

Address: 515 Fifth Street NW, Building A, Room 117 (Street) (Apt. #)

Washington (City) DC (State) 20( (Zip)

Telephone No.: 202-638-1501 Attorney's Bar No., if known: ______

C. Have you filed a complaint about this matter anywhere else? ☐ Yes ■ No // If yes, please give details.

D. Do you have a written retainer agreement with the attorney? ☐ Yes ■ No // If yes, please attach a copy.

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.

N/A

F. Do you have other documents that are relevant? ■ Yes ☐ No // If yes, please give details and provide copies.

See attachment with exhibits

**SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE**

G. DETAILS OF COMPLAINT: See attachment with exhibits

**The Undersigned hereby certifies to the Office of Disciplinary Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge.**

SIGNATURE

**ATTACHMENT**

I HEREBY FILE THIS ETHICS COMPLAINT against Disciplinary Bar Counsel Hamilton Fox ("Mr. Fox"), Deputy Disciplinary Counsel Elizabeth Herman ("Ms. Herman"), Assistant Disciplinary Counsel H. Clay Smith, III ("Mr. Smith"), Deputy Disciplinary Counsel Julia Porter ("Ms. Porter"), and any other Deputy or Assistant Disciplinary Bar Counsel or other licensed attorney or investigator such as Kevin O'Connor employed by the Office of Disciplinary Counsel ("ODC") who has participated in and worked on in any way a matter concerning a complaint allegedly filed in the name of Elham Sataki ("Ms. Sataki")[1] against Larry Klayman ("Mr. Klayman") on November 2, 2010, nearly eight years ago. This on-going case has now unethically and tactically resulted, as set forth below, into a Specification of Charges against Mr. Klayman filed with the Board of Responsibility. It is styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

This instant ethics complaint is predicated and founded upon serious misconduct committed by ODC attorneys and their agents, acting under the color of state law, which are in clear and gross contravention of the following District of Columbia Rules of Professional Responsibility (hereafter D.C. Ethics Rules): Rule 8.4-Misconduct; Rule 4.4 – Respect for Rights of Third Persons; Rule 4.1 – Truthfulness in Statements to Others; Rule 3.8 – Special Responsibilities of a Prosecutor; Rule 3.3 – Candor to Tribunal; Rule 3.1 – Meritorious Claims and Contentions; Rule 3.4 – Fairness to Opposing Party and Counsel; Rule 1.1 – Competence; Rule 1.7 – Conflict of Interest; and Rule Rule 4.3 – Dealing with Unrepresented Person.

Attached hereto as Exhibit 1 is correspondence from complainant, Mr. Klayman, which sets forth the underlying facts upon which ODC's unethical and frivolous ethics proceeding was wrongfully instituted and on which it is based. Mr. Klayman reserves the right to supplement this complaint as more facts become known.

From the very outset, there has been a conscious disregard for Mr. Klayman's due process, equal protection, and other rights by ODC attorneys and their agents. Indeed, Mr. Klayman had requested to meet with Mr. Fox before the Specification of Charges based on Ms. Sataki's baseless allegations was apparently filed against Mr. Klayman with the Board of

[1] It remains unclear who filed the complaint as set forth in prior correspondence with Bar Disciplinary Counsel

Professional Responsibility. *See* Exhibit 1. This simple request was ignored, contrary to established professional courtesy and practice by ODC, thereby denying Mr. Klayman due process, equal protection and other rights in what amounts to what in effect is technically a criminal proceeding. Thus, based on this and the rationale set forth below, Mr. Klayman submits that he is the subject of a political and gender based tactical prosecution by the ODC, which is clearly in violation of the D.C. Ethics Rules.

The Sataki Complaint is not based upon fact or law, much less the clear and convincing evidence that is required to substantiate these types of claims. Indeed, the tactical purpose for the sudden, unexplained, and unwarranted revival of Ms. Sataki's Complaint, after 8 years of delay and after two other state bars summarily and time dismissed identical complaints – Pennsylvania and Florida -- hinges on the hearing committee's remedial recommendation with regard to the Judicial Watch ethics complaint against Mr. Klayman, Bar Docket No. 2008 D048 ("the Judicial Watch Complaint") that Mr. Klayman must after serving his proposed three-month suspension then petition for reinstatement based on the fitness to practice law. Thus, if ODC can "pile on" by filing a new case or cases before the Board – indeed Tom Fitton[2] has filed a new non-meritorious and vindictive complaint against Mr. Klayman (Bar Docket No. 2017-D051) - as it has done with regard to Ms. Sataki's complaint, it can argue that this on-going proceeding, which would go on for years, would be grounds for Mr. Klayman not to be reinstated, effectively disbarring him, especially since he is now almost 67 years old – in effecting involuntarily retiring of Mr. Klayman. Furthermore, it is evident that ODC's goal, regardless of the outcome of the Sataki Complaint, is to financially drain Mr. Klayman by forcing him to expend significant resources – attorney's fees, costs, and travel to say the least – as another way to limit his ability to carry out his public interest work and legal practice in general.

Tellingly, it is evident that Ms. Sataki did not actively pursue her initial complaint against Mr. Klayman, but instead it was ODC who *sua sponte*, for their own tactical and unethical purposes, chose to revive it. In a letter from ODC to Ms. Sataki dated July 7, 2011, in response to

[2] It shocks the conscience and mind that the ODC relies so much on Mr. Fitton, who lost a defamation suit against Mr. Klayman and had to pay $181,000 to Mr. Klayman. Usually, one who is found guilty of *New York Times* malice scienter, i.e., knowingly *lying* is not a credible witness. A federal jury in the U.S. District Court for the Southern District of Florida has already found that Mr. Fitton and his other directors had lied and Judicial Watch has been found liable to pay a judgment of $181,000, which included punitive damages for malice.

Mr. Klayman's answer to the initial complaint, ODC stated, "if we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanation." Exhibit 1. It is clear from correspondence that ODC did not hear anything from Ms. Sataki, who apparently decided not to pursue the complaint against Mr. Klayman further at that time. Exhibit 1. Yet, in 2014, ODC, for its own illegal, unethical, and tactical purposes, sought to revive the Sataki Complaint, despite the fact that Ms. Sataki had, in their own words, "dropped off the map." Exhibit 1. ODC even went so far as to use a forensic investigator, Mr. O'Connell, to try to locate Ms. Sataki to try convince her to pursue her complaint against Mr. Klayman. This unethical and illegal behavior not only ignores the defaulting actions and abandonment of the complainant, but show a clear malice and animus against Mr. Klayman that has undeniably tainted this entire proceeding.

In fact, the dishonesty of ODC and the fact that the sudden revival of the Sataki Complaint is nothing more than an unethical and unprofessional tactical strategy is strongly evidenced by ODC's filing of an assignment of error to the Board's decision to remove the reinstatement provision in the Judicial Watch Complaint. Indeed, the reason that the Board reversed its decision and removed the reinstatement provision is that it it found that Mr. Klayman had been honest that he had effectively received advice of counsel to take the acts he had been charged with. ODC never really challenged this finding at the time, yet still filed an assignment of error after the fact. Indeed, even Mr. Smith told Mr. Klayman that he was relieved that the reinstatement provision was removed, as he "didn't think it was right." However, he said the filing of the assignment of error was "out of his hands."

When questioned about the filing of the assignment of error, Mr. Fox lied to Mr. Klayman that it was "policy" to appeal everything that reversed a finding of fact by the Board. In sum, Mr. Fox and ODC are dishonestly appealing a fact that they and the Board know to be true. This, in turn, "tips their hand" and clearly evidences the importance of the reinstatement provision to them as the mechanism that they wish to use to fulfill their goal to have Mr. Klayman effectively disbarred, because as ODC has admitted in legally audio taped conversations[3] and recorded in contemporaneous memoranda, they "do not like the way Mr.

[3] Recording occurred in one party consent jurisdictions

Klayman practices law."[4] Indeed, the latest Judicial Watch Complaint was inexplicably transferred from Mr. Smith – who at least always had been respectful and professional, even if compromised by others at ODC - to Ms. Porter, who is part of and has participated ODC's apparent bias and animus much more unethical conduct leveled against Mr. Klayman, which is set forth in detail below.

*First*, as set forth in Exhibit 1, an identical complaint by Ms. Sataki was filed with the state bars of Florida and Pennsylvania and summarily dismissed many years ago. When Mr. Klayman advised Ms. Herman at a meeting designed to head off the prosecution of the Sataki Complaint, she on behalf of ODC stated that they could care less. Yet it should be at least relevant that other Bars have looked at these charges and dismissed them as not based on any credible evidence, much more the required clear and convincing evidence necessary to justify commencing a bar proceeding. It should also be relevant and compelling that these other Bars dismissed the the Sataki Complaint 7 years ago. For reasons that the ODC never bothers to and refused to explain, why it has waited seven years. This blatant disregard for the facts demonstrates that Ms. Herman and her colleagues at ODC have no concern with whether the Sataki Complaint is meritorious, in gross violation of D.C. Ethics Rule 3.1, and that she is not acting pursuant to the law or the facts, but instead their own desire to harm Mr. Klayman. Even more, when considering the function of ODC, and its parallels with those of prosecuting attorneys, D.C. Ethics Rule 3.8 which prohibits prosecutors from:

> (a) In exercising discretion to investigate or to prosecute, improperly favor or invidiously discriminate against any person; (b) File in court or maintain a charge that the prosecutor knows is not supported by probable cause; (c) Prosecute to trial a charge that the prosecutor knows is not supported by evidence sufficient to establish a prima facie showing of guilt; (d) Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense….

Shockingly, Ms. Herman and her named respondent colleagues, all of whom have acted in concert, have unethically done all of these things.

---

[4] How Mr. Klayman practices law is not arrogantly ODC's business; only whether he has violated the District of Columbia Code of Professional Responsibility.

Supporting Mr. Klayman's substantiated belief that he is being selectively prosecuted for his politics and gender, is the extremely hostile and disrespectful demeanor and words Ms. Herman exhibited during a meeting that occurred on July 28, 2017. As diplomatically set forth in Exhibit 1, which politely understated Mr. Klayman's reception by Ms. Herman, showing animus, she curtly and nastily refused to say whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was none of his business. Furthermore, Ms. Herman's brazenly and openly admitted her personal bias and animus against Mr. Klayman, which explains her participation in her and ODC's baseless prosecution against him, when she abruptly, curtly and disrespectfully admitted to Mr. Klayman, "I don't like the way you practice law." Ms. Herman's personal feelings should have no impact on the performance of her professional duties, but her open admission clearly shows that she is driven by her bias and animus. Thus, Mr. Klayman was not only insulted disrespectfully in violation of D.C. Ethics Rule 3.5[5], which in effect requires lawyers to be courteous among one another, it was more than a disturbing response, since Mr. Klayman had never spoken or met with Ms. Herman before.  Among other very hostile statements, there was also Ms. Herman's demeanor, which showed deep animus, as if Mr. Klayman disrespected women such as Ms. Sataki. Taken as a whole, it appeared that the Sataki case was being pursued based on Ms. Herman's view that Mr. Klayman is anti-women, which is blatantly untrue. Feeling this strongly, Mr. Klayman, as recorded in Exhibit 1, pointed out that he is good friend with famed female rights lawyer Gloria Allred, who he had even approached to represent Ms. Sataki when Mr. Klayman felt that he could do so no longer.

A review of Ms. Herman's political leanings, as well as Bar Disciplinary Counsel Hamilton Fox, as easily found on the internet and in Federal Election Commission records of political campaign contributions, further explains her (and Mr. Fox's) motivations and personal and political animus against Mr. Klayman, and also explains her gross misconduct in handling these matters against Mr. Klayman. She has donated to the campaigns of Barack Obama and other leftist Democrats, who Mr. Klayman has sued in his public interest capacity. It is certain that Ms. Herman's animus toward Mr. Klayman stems from her perception that he is anti-Obama, anti-Hillary Clinton, anti-Democrat, and anti-women. In any event, complainant firmly

---

[5] *See* Comment 4: "Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants."

believes that among other ethical violations, particularly given the there is no clear and convincing evidence that Mr. Klayman violated any D.C. Ethics Rules as set forth in Exhibit 1, and that Bar Disciplinary Counsel - after seven long years of sitting on an identical complaint that had been summarily dismissed by two other state bars and abandoned by Ms. Sataki - rushed to file the Sataki Complaint before the Board of Professional Responsibility before he was even accorded the courtesy of meeting with Bar Disciplinary Counsel, Mr. Fox. Ms. Herman, Mr. Fox, and the other respondents are blinded by their prejudice and personal animosity towards Mr. Klayman, in violation of her legal, professional, and ethical duties.[6]

Regrettably, this squares with what Mr. Smith told Mr. Klayman at the side meeting of June 28, 2017, concerning the on-going Judicial Watch proceeding now before the Board, that his hands were tied, that the issue of Mr. Klayman's fate lied with the higher ups and that after Wallace "Gene" Shipp retired, that there was a different leftist mindset in the office toward Mr. Klayman, who is a conservative activist and openly pro-President Donald Trump, having filed lawsuits and taken other strong legal actions to remove Robert Mueller as Special Counsel. Indeed, once when Mr. Klayman asked Mr. Smith for an extension of time to respond to an issue, Mr. Smith informed him that he himself would face discipline if he consented to an extension. This clearly flaunts the D.C. Ethics Rules that mandate that attorneys should be courteous and avoid abusive behavior.

*Second*, this matter is now, as again set forth in Exhibit 1, nearly 8 years old. During this time, Mr. Klayman's files were lost, memories of witnesses have faded, evidence has been misplaced, and material witnesses cannot be located. As set forth by Professor Ronald Rotunda, a renowned ethics expert, who has written the premier treatise on legal ethics under American law, this unnecessary and unexplained delay denies Mr. Klayman due process and other crucial constitutional and other rights, notwithstanding issues involving laches. This also invokes the competency requirement of the D.C. Ethics Rules. It would appear, again as explained in Exhibit 1, that ODC not only failed to process and consider Ms. Sataki's Complaint timely, and instead sat on it for going on a decade, but also buried intentionally and unethically ignored the same response that Mr. Klayman had successfully submitted to Florida and Pennsylvania, which

---

[6] In the case of Mr. Smith, he simply goes along with and thus ratifies the ethical violations set forth herein, admitting to fear retaliation and discipline by his superiors, Mr. Fox, Ms. Herman, and Ms. Porter.

resulted in the summary dismissal of Ms. Sataki's Complaint. Indeed, Mr. Klayman has already provided a considerable amount of authority, as set forth by legal ethics expert Ronald Rotunda, that the nearly eight-year delay is inexcusable and serves as basis for dismissal of the Sataki Complaint. *See Florida Bar v. Rubin*, 362 So. 2d 12 (Fla. Sup. Ct. 1978)(per curiam); *The Florida Bar v. Walter*, 784 So. 2d 1085, 1987 (Fla. Sup. Ct. 2001) (ruling that a seven-year delay between a lawyer's alleged misconduct and the filing of a bar complaint is ethically improper). Exhibit 1.

Thus, ignorance of or lack of concern for the law is no excuse for the unethical conduct of ODC. The revival of the Sataki Complaint was a willful and tactical decision meant to punish Mr. Klayman for his advocacy work and his political beliefs, activism, and gender.[7] Lastly, this unethical misconduct is in clear violation of D.C. ethics Rule 3.2, which states that (a) In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another…(b) A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

*Third*, when Bar Disciplinary Counsel informed Mr. Klayman that the Sataki Complaint was pending against him and had actually not been dismissed after all of these interim years, they were asked by Mr. Klayman to forward any documents which Ms. Sataki had submitted to ODC, as well as other documents in the file. However, ODC through Assistant Bar Disciplinary Counsel H. Clay Smith III and Deputy Bar Disciplinary Counsel Elizabeth Herman, apparently and inadvertently sent the Specification of Charges before the Board of Professional Responsibility which had been prepared before Mr. Klayman's supplemental response was even made. Thus, this Specification of Charges, as set forth in Exhibit 1, was prepared before Mr. Klayman learned (to his surprise) that Ms. Sataki's abandoned Complaint remained pending after over 7 years. This dishonest prejudgment of Ms. Sataki's Complaint violates of a number of the D.C. Ethics rules cited above, not the least of which Rule 8.4 – Misconduct; Rule 3.4 – Fairness to Opposing Party and Counsel; Rule 3.1 – Meritorious Claims and Contentions; and others as

[7] Tellingly, the Judicial Watch Complaint has been pending for over ten years. ODC has engaged in a pattern and practice of abusive and hostile behavior, abusing their position of authority to carry out their own biases and preconceptions.

apply to this outrageous and unethical conduct. (add provisions dealing with the administration of justice)

*Fourth*, this political and gender based "vendetta" against Mr. Klayman is clearly demonstrated and confirmed in a meeting that that Mr. Klayman had with Mr. Smith on September 29, 2017, after the previously mentioned meeting with him that occurred on June 28, 2017.  The purpose of this meeting was to discuss the second Complaint filed by Mr. Fitton, as well as the pending Sataki matter. Mr. Smith strangely suggested that rather than appeal the committee's findings with regard to the first Fitton/Judicial Watch Complaint alleging conflicts of interest to the Board, that he simply agree to disbarment. Mr. Smith then stated that if Mr. Klayman would agree to this could be done quietly and that no one else would know, preventing embarrassment to Mr. Klayman. This obviously is not only a false premise, and contrary to the remedies that had been previously recommended to the hearing committee by ODC, which fell bar short of disbarment.   In addition, how can one have a "quiet" disbarment!   However, apparently seeing that the hearing committee was recommending three months' suspension with a requirement of petitioning for reinstatement based on a showing of the fitness to practice law, ODC - through Mr. Smith -  now suggested the agreed disbarment would be the easier and less humiliating road for Mr. Klayman to agree to. Mr. Klayman was confused at the time as to why Mr. Smith would made such a strange suggestion, but in retrospect Mr. Klayman believes that it was a warning to Mr. Klayman that there was a concerted effort by his superiors and others at ODC to remove him from the practice of law that was beyond his control, which has now been clearly demonstrated in ODC's actions.

*Fifth*, it is clear, as set forth in Exhibit 1, that the above named ODC attorneys, acting in concert, pursued and filed the Specification of Charges before the Board, without even providing a professional and courteous opportunity for Mr. Klayman to meet with Mr. Fox, as politely requested and as set forth again in Exhibit 1, because their goal is to try to disbar Mr. Klayman, based on his political advocacy, gender and their related biases and prejudices. This refusal to allow a meeting is also due to the conflicts of interest that Mr. Fox claimed to have suffered, for which Mr. Fox was trying to cover himself. Indeed, while it was clear that Mr. Fox had been involved in the prosecution of Mr. Klayman from the very outset, he demanded that Mr. Klayman sign a conflict of interest waiver before finally arranging a meeting after the Specification of Charges had been filed before the Board.  The conflict of interest – which Mr.

Fox clearly recognized – stems from the fact that Mr. Fox, while previously a lawyer at Sutherland, Asbill and Brennan, represented Mr. Klayman's interests when he defended a deposition of his then partner, Herbert Beller, noticed by Judicial Watch, the public interest group which, through its president Tom Fitton, had complained against Mr. Klayman in the pending matter now before the Board of Professional Responsibility and District of Columbia Court of Appeals. Mr. Beller and Sutherland had represented Mr. Klayman in his severance negotiations with the other Judicial Watch Directors as he was leaving to run for the U.S. Senate in Florida. Indeed, Mr. Klayman just discovered recently that Mr. Fox's name still appears on the district court's service list in a case which Mr. Klayman was forced to file against Judicial Watch for subsequently breach of this severance agreement, which Mr. Fox's then law firm negotiated for Mr. Klayman. In sum, Mr. Fox clearly had a conflict of interest in taking action in concert with the other persons named in this ethics complaint, designed to have Mr. Klayman disbarred or effectively removed from the practice of law, even before he compelled Mr. Klayman to sign a waiver before granting a customary meeting.

Mr. Fox's unprofessional and unethical behavior towards Mr. Klayman has not lessened but only increased over time. During a May 11, 2018 meeting to discuss the Sataki Specification of Charges, and the gross misconduct of the ODC attorneys to that point, for which Mr. Klayman had substantial evidence, including but not limited to audiotaped conversations with respondents, Exhibit 1, Mr. Klayman was surprised to find that both Ms. Porter and ODC's described investigator, Kevin O'Connor were present in the meeting, which had not been disclosed previously. From the outset, Mr. Fox immediately and belligerently stated that he was not going to hear anything about or discuss dismissal of the Specification of Charges, but that Mr. Klayman could simply produce the evidence of misconduct and unethical behavior. Mr. Klayman calmly responded that he would not be dictated to as to what he could discuss. This prompted Mr. Fox to stand up threateningly and scream "this meeting is over" and that Mr. Klayman "should leave [his] office." When Mr. Klayman got up from his chair, he indicated that this gross misconduct would leave him no recourse but to file this instant Complaint and court litigation. Mr. Fox then approached Mr. Klayman at the door, as if to hunt him down and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law." This more than confirms what Ms. Herman had previously admitted, that Mr. Fox and ODC's improper

motivation and mission is to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical and illegal means are needed to "justify" these ends. As with Ms. Herman, who had stated that she "did not like the way [Mr. Klayman] practices law" Mr. Fox's demonstrated animosity also likely stems, at least in large part from his own political leanings and gender given the current "Me Too" atmosphere – although Mr. Klayman is not accused of sexual harassment. Not coincidentally, Mr. Fox has contributed significant amounts of monies to Barack Obama and other democratic politicians. Again, in the course of Mr. Klayman's public interest work, he has sued Mr. Obama, Bill and Hillary Clinton and prominent Democrats and others numerous times. Mr. Klayman's interactions with ODC have confirmed that they are looking for way to try to remove him from the practice of law, including trying to get discovery into Mr. Klayman's practice for improper purposes.

*Sixth*, the main witnesses in Ms. Sataki's case are Ms. Sataki, Mr. Klayman, and Mr. Tim Shamble ("Mr. Shamble"), the AFL_CIO president and union official who represented Ms. Sataki along with Mr. Klayman at the events of over seven years ago. Mr. Shamble has no reason to be anything but truthful. After all, he represented Ms. Sataki in the events that she now claims merit some sort of bar discipline.  Mr. Shamble will testify, as the submitted sworn affidavits show, that Ms. Sataki is simply wrong - perhaps lying, perhaps misremembering - but clearly wrong about all the complaints she has.  Mr. Shamble is a completely objective witness. Despite the fact the Mr. Klayman has submitted sworn affidavits by Mr. Shamble to this effect, ODC and the respondents have apparently decided to give no weight to this testimony, for the sole reason that it vindicates Mr. Klayman and is therefore of no use in perpetuating their clearly demonstrated vendetta against Mr. Klayman. This, and other compelling evidence that Mr. Klayman submitted to ODC, including an affidavit of Keya Dash and an ethics opinion by Professor Ronald Rotunda before the specification of charges were filed, clearly constitutes professional misconduct under D.C. Ethics rule 8.4 (c) and (d), which prohibit a lawyer from engaging in conduct "involving dishonestly fraud, deceit, or misrepresentation" or "that seriously interferes with the administration of justice." Essentially burying exculpatory evidence indisputably falls under these provisions. Exhibit 1.

*Seventh*, as evidence of ODC's selective prosecution targeted at Mr. Klayman has mounted, it quickly and unethically disposed of a valid Complaint filed by Mr. Klayman against Paul Orfanedes ("Mr. Orfanedes"), Judicial Watch's litigation director, centered around Mr.

Orfanedes' participation in a misappropriation, that is theft, of 1.4 million dollars of donor money. In fact, Ms. Herman admitted that this complaint was summarily dismissed, less than a month after it was received, and it was never even processed or opened for a full investigation. Exhibit 1. On the other hand, the clearly non-meritorious Sitaki Complaint, which not based in law or fact (which has been demonstrated to ODC through sworn affidavits), has been pending against Mr. Klayman for almost eight years, as well as another 10-year-old proceeding. This striking dichotomy is clear evidence of selective prosecution, bias, and personal animus that must be remedied.

Mr. Klayman will not elaborate further, as most of the underlying facts are set forth in Exhibit 1, and he will supplement this ethics complaint in the near future. But for the time being, a review of the DC Ethics Rules, when analyzed with the underlying facts – which ODC claim to be "experts" at - shows that ODC and their named respondents have violated their own ethical standards. They are supposed to act with disinterested objectivity in enforcing the DC Rules. Instead, they are motivated by politics and gender. They, like other attorneys licensed in the District of Columbia, are not above the law. And, that is regrettably why this ethics complaint must be filed, and why it must be adjudicated before the Board of Professional Responsibility without delay.

Please have non-conflicted persons who are not employed by ODC contact me, as I would like to speak and meet with them about this serious matter, as I attempted to do with Mr. Fox. Indeed, ODC has shown to be deeply prejudicial against Mr. Klayman. As just one example among many, Ms. Sataki's prejudicial *ex parte* and undisclosed communications apparently are off limits to Mr. Klayman, as Ms. Herman would not reveal any of them – since she angrily and with palpable animus told Mr. Klayman that they are none of his business.  But the instant ethics complaint is any ethical lawyer's business, even those employed and who work for ODC. Indeed, as publicized on the ODC's own website, one of its two functions is to "protect members of the D.C. Bar from unfounded complaints." It is clear that they are unethically violating this duty.

Lastly, it is evident that ODC cannot be tasked with investigating and taking action on this Complaint, as it is their own gross misconduct and unethical behavior that is at issue. In this regard, Mr. Klayman advocates speaking with a non-conflicted person about other avenues to carry out this investigation, perhaps by a mutually agreed retired jurist or a distinguished,

scholarly, and independent minded lawyer. Mr. Klayman is in possession of compelling evidence of ODC's and respondents' gross misconduct and unethical behavior set forth above, including audio recordings, and will provide them to a non-conflicted, neutral investigative body, along with other supporting evidence.

This is a serious matter which cannot be swept under the carpet and covered up by ODC. This complaint by Mr. Klayman must be processed and administered to fairly and ethically, without conflict of interest by the named respondents. What is good for the gander is also good for the proverbial goose, and ODC and its lawyers and agents must in the end be held fully accountable for its grossly unethical acts to try to remove Mr. Klayman, improperly and without cause, from the practice of law because they apparently decided that they "do not like the way he practices law" as a public advocate against political and gender based interests and views they personally hold dear and have even financially supported.

The named respondents in this bar disciplinary complaint must immediately recuse themselves from any and all participation in *In re: Klayman*, Bar Docket No. 2011-D028, as they have manifest conflicts of interest given their unethical behavior and the enumerated unethical misconduct towards Mr. Klayman.

Finally, just in the last days, the Respondents including Mr. Smith, at the direction of Mr. Fox, Ms. Herman and Ms. Porter, furthered and contrived and/or assisted Ms. Sataki with false representations by that she could not agree to a suitable and mutually agreeable timeframe to reset the hearing date in the otherwise unethical on-going proceeding before the hearing committee, as set forth above, due first to her employer's vacation schedule, claiming incredulously that she would have to quit her job. When this appeared not to carry the day, she submitted, contrived, and likely falsified, at the 12th hour before a hearing on Mr. Klayman's motion to continue, a letter by her alleged physician stated that she could not reschedule because of an impending neck procedure. The doctor, who is undoubtedly a member of Ms. Sataki's close knit community in Los Angeles, was not consulted by ODC, nor was Ms. Sataki's employer, and thus at a minimum ODC and the named respondents either failed to do a due diligence, or knowingly furthered false and misleading information having been put forth to the hearing committee, resulting in the denial of Mr. Klayman's motion for a short continuance to further deny him due process, equal protection and other rights.

Respondents also sent to Mr. Klayman recently the bar disciplinary file of another lawyer, thus violating that lawyer's rights to confidentiality by illegally disclosing his case. The victim of this misconduct is Tim Guy Smith. While Mr. Klayman did not review the substance of the file, which includes confidential banking records, and is returning the file to the ODC, it underscores ODC's and the respondents' unprofessional, careless and unethical modus operandi with Mr. Klayman's case as well, contrary to the proper practices of the Pennsylvania and Florida bars which summarily dismissed Ms. Sataki's complaint against Mr. Klayman many years ago.

For all of the compelling reasons, the ODC and respondents must be severely disciplined for their grossly dishonest, unethical, and unprofessional misconduct. They are not above the same ethics and law, which other lawyers of the District of Columbia Bar are required to respect and adhere to, even if they think and act as if they are.

# EXHIBIT 1

Via Email, Fax and Mail

July 10, 2017

Mr. Hamilton P. Fox
Bar Counsel
Office of Bar Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20006

      Cc: Elizabeth A. Herman, Deputy Bar Counsel
          H. Clay Smith, III, Assistant Bar Counsel

Re: In re Klayman, Esquire Docket No. 2011-0028.

Dear Mr. Fox:

I am writing this letter to summarize the materials which I have provided to Bar Counsel, as well as my discussion with Deputy Bar Counsel Elizabeth A. Herman and Assistant Bar Counsel H. Clay Smith, III, on June 28, 2017. I am also attaching my previous letter response of December 19, 2016, along with correspondence from legal ethics expert Ronald Rotunda. It is hoped that you will have an opportunity to review these materials, along with the copious documentation which I have provided concerning my representation of Ms. Elham Sataki, before a decision is made whether to proceed with a complaint. In this regard, as we have never met, and as I would like to speak with you about this rather old matter, I would respectfully request an opportunity to meet with in person before any decision is made. As this matter is almost 7 years old, and as I thought it had been dismissed as occurred with the state bars of Florida and Pennsylvania bars years ago, no prejudice will result if I have a chance to meet with you about this case.

To reiterate, this matter is now almost 7 years old. The initial complaint filed by Ms. Sataki in her handwriting was filed on our about November 2, 2010. There she simply complains that I attempted to contact her after she terminated my representation. As the letters, emails and documents which I have submitted to Bar Counsel attest and show, I, as well as Ms. Sataki's union representative and the president of the AFL-CIA local chapter of Voice of America (VOA) show, her union representative and I only informed her that she would not lose her rights to file though other counsel or on her own a Title VII action, after her initial EEO complaint had been administratively denied. However, she apparently decided to not pursue her claims.

When some months ago, I surprised to learn that this DC Bar matter had not been closed after going on 7 years – as I had heard nothing during this interim period -- I met briefly with Mr. Smith after I delivered copious court pleadings and other related documents in Mr. Shamble's file to him, and he advised that the primary issue here was whether I had abandoned Ms.

Sataki's claims. [This claim is, frankly, strange, because she also complained, see prior paragraph, that it was wrong for me (and apparently also wrong for her union representative) to contact her to tell her that she had to do certain things so as not to lose her rights.] After having an opportunity to show that this was not the case, and after have Mr. Smith had a chance to speak with and interview Mr. Shamble, I have been advised that this is no longer an issue. According to Mr. Smith, Mr. Shamble attested to the fact, as also set forth in an attached affidavit which he wrote and I must have submitted to Bar Counsel years ago, that I worked diligently and zealously on Mr. Sataki's behalf. Indeed, the other day Mr. Smith told me, in front of Ms. Herman, that Mr. Shamble had never seen any attorney make the effort I did for any broadcaster or employee or VOA. In fact, he recommended me to other broadcasters and employees of VOA who also had been allegedly subjected to workplace harassment or retaliation. Mr. Shamble's affidavit attests to VOA being consistently ranked the worst agency in government, particularly as a result of how it treats its employees and its refusal to consider their claims.

I am attaching another affidavit from Mr. Shamble, after he confirmed the other day that Ms. Sataki also approved of publicity to move her case along to a hoped for successful settlement or resolution. Mr. Smith said he would speak with Mr. Shamble, but apparently had not yet had an opportunity to do so given the recenty holiday, so I am submitting this supplemental affidavit.

This is because II was surprised to learn at the meeting with Ms. Herman and Mr. Smith that an issue remains as to whether I publicized Ms. Sataki's case without her permission. As Mr. Shamble attests, however, and as demonstrated by the attached email to him and Ms. Sataki – wherein we all were arranging to have Ms. Sataki interviewed by the Los Angeles Times (the email is also copied on other supportive VOA broadcasters in the Persian News Network as they had related grievances about how they were treated), this allegation is simply not true. As Mr. Shamble will emphasize **Ms. Sataki agreed to this** as a way to move along and try to coax a settlement or other resolution from VOA management. It is not a secret the public relations can often be "persuasive" in getting government to act favorably for a client, and is an accepted staple of Washington, D.C. practice.

In addition, I also previously submitted to Bar Counsel another attached affidavit, this one from Keya Dash, which also attests to his being present when use of the media was discussed with Ms. Sataki to move this case to a favorable conclusion. Mr. Dash swears under oath that she approved of this. Thus, there are at least three witnesses, including myself, who provide evidence that the public relations which we undertook was approved by Ms. Sataki. Her ex post facto claim to contrary is hardly clear and convincing evidence. Indeed, as an activist and as a broadcaster she obviously understood the value of good media. And, at all times whatever we publicized was extremely complimentary of her.

That I wrote a few articles after representation ceased was only because I was upset about the way she had been treated by VOA management and the legal system. The information which I wrote about was public at that point with her consent, and not confidential. At all times, what I

wrote was again extremely favorable and complementary and did not violate client confidences.

Importantly, I first met Ms. Sataki on the Capitol Mall when she was covering an Iranian freedom protest. I was there because I was trying to help others who had been persecuted by the regime in Tehran. I introduced myself to her, and told her about a case I had filed for slain and imprisoned victims of the regime. As I left she ran over to me and gave me, unsolicited, her personal phone number on the back of her card.

I later invited her to dinner at Clydes in Georgetown and as we ate she grabbed my hand and started crying and later sobbing, telling me about the alleged sexual and workplace harassment that she had allegedly endured at VOA. My heart went out to her and when she said that she was destitute and had no money, and asked if I would try to help her, I later agreed. I myself had been going through a difficult time in my life, and I identified with her problems.

Since Ms. Sataki had no money, I agreed to help her as a friend, pro bono, and over time I began to sympathize with her and care deeply about her. There is no crime in caring about someone and doing all one can to try to help her. In fact, I worked harder because I cared and the statements of Mr.Shamble show how much I worked on her behalf. However as newly provided correspondence to Arlene Aviera on or about May 9 and 10, 2010, show (which I discussed with Ms. Herman and Mr. Smith), when I realized that I was getting personally involved, and that Ms. Sataki, as is common in victims, was very difficult to deal with, I advised that it would be best if new counsel were obtained as I foresaw a potential conflict. I suggested two lawyers, one of which was Gloria Allred, a friend of mine in LA. Ms. Allred later declined representation as she does not handle government employment claims but the correspondence shows that another one which Mr. Shamble recommended, Mr. Tim Shea, was also referred to her.

Importantly, my concern for Ms. Sataki, as I stated previously in my correspondence, was never sexual in any way! I never kissed her nor propositioned her; nothing! But I did come to care deeply about her despite her treating me poorly, which is part and parcel to a "victim complex" I came to believe. My persona is to care deeply about people and things. That is why I founded Judicial Watch, ran for the U.S. Senate in 2003-2004 in Florida, and later founded Freedom Watch. I am a public interest lawyer and I do respect the rules of ethics and people and principles. My service as a Justice Department trial lawyer also underscores this.

Indeed, and consistent with my years of public service, when Ms. Sataki told me that she had no money and could not even afford a place to stay in Los Angeles, as she wanted to return home to her doctors and be away from the harasser in VOA's D.C. headquarters, although I was not financially well of at that time I obtained an apartment for her in Los Angeles and paid the rent. I also fronted other costs, including for movers from D.C. (and am out of pocket well over 15 thousand dollars). When I ceased to represent her, I did not ask to be paid back and I knew that she could not afford this anyway. I represented her as friend, and indeed Ms. Sataki exploited this friendship, even at one point asking me to buy her a new car. (See

communication to Arlene Aviera styled "Discussion for Meeting This Thursday" transmitted to her on or about May 9-10, 2010 at para. 2). This is when I realized that she should retain other counsel, as the relationship was growing too personal. Thus, this request to me to buy her a car is, again, documented to Arlene Aviera which I discussed with Ms. Herman and Mr. Smith on June 28, 2017 and which is in our offices' possession. Id.

Over the last 7 years, I did not keep much that was in my original files, as it was discarded as a result of my moving around a lot from coast to coast during difficult times in my own life. Thus, most of what I was able to submit to your office when I was surprised to learn that the matter was still pending after all of these years,  was obtained from Mr. Shamble's files or other sources and court files which I had printed off of Pacer at great expense.

In short, I did the right thing when I saw the potential for a conflict of interest. And, I should not be charged with an ethics complaint because I cared for Ms. Sataki and did all I could to help her. This would be absurd and tantamount to saying that a lawyer should not be permitted to help a client pro bono and represent her out when she was in dire straits and could not even afford a place to live. It would also be tantamount to saying that an attorney should be heartless and simply an "insensitive robot." I respect woman and women's rights and that is one reason why Ms. Allred, a renowned woman's rights advocate, is my friend as well, as I told Ms. Herman and Mr. Smith.

Moreover, as stated in earlier submissions, Ms. Sataki and I did not communicate about a possible contingent fee arrangement until it became clear, as set forth above, that representation, if it continued at all, needed to be put a more professional footing.  However, my representation ended shortly after that for the reasons stated and thus there never an opportunity to convert the discussion about a contingent fee into a written representation agreement.

Mr. Fox, I wish to point out that at the meeting with Ms. Herman and Mr. Smith the other day, I sensed some hostility on Ms. Herman's part. I do not understand why, as I had never before met or spoken with her. As a result, I asked her if she had had a lot of contact and met with Ms. Sataki. She responded that she did not have to answer that.  I have no idea why she should refuse to answer that question.  I respect Ms. Herman, and I want her to understand that I am not anti-woman or anti-Ms. Sataki.  (I thus cannot respond to any claims that Ms. Sataki made at her private meeting with Ms. Herman.)  I did all I could to try to help Ms. Sataki, but apparently many years later Ms. Sataki has become bitter about what happened to her. Apparently she has decided to strike out against me regrettably and unfairly as a scapegoat. She filed charges with three bar disciplinary counsel in three jurisdictions.  The other two complaints were dismissed, as I documented previously in correspondence with your office.  I sympathize with her frustrations with the legal system, but I am not to blame. I did all I could for Ms. Sataki and regret she did not get the result she wanted. But I sincerely and diligently tried. I emphasized this with Ms. Herman and Mr. Smith before the holiday when we met in your office.

A few months ago, before I even learned that Ms. Sataki's complaint was pending after going on 7 years, as again I thought that it had been dismissed as occurred with Florida and Pennsylvania, I was sitting in an outdoor restaurant having lunch with my chief of staff in Beverly Hills, and a woman charged up to both of us screaming "this man ruined my life!" I realized that this was Ms. Sataki after a "double take, " as I had not had contact with or seen her in many years. This was before Mr. Smith advised me that her complaint was still pending after all of this time.

In the course of this very loud and physically verbal explosion, Ms. Sataki thrust herself in the direction of me and my chief of staff and, screaming, demanded that she contact her so she could reveal more about "what a terrible person this man is." Ms. Sataki left after about 30 seconds of screaming, but then abruptly ran back again tersely inviting my chief of staff to contact her. My chief of staff was horrified and I was very embarrassed and humiliated to say the least. Later, more communications were directed to and sent by Ms. Sataki to my chief of staff disparaging me. In short, Ms. Sataki defamed me with my staff.

Mr. Fox, I am saddened that Ms. Sataki feels this way, but I am not to blame. I would thus like to meet with you in the near future, so you can guage my sincerity and the underlying facts and circumstances, and get a sense of who I am before a decision is reached on Ms. Sataki's complaint. Given the passage of time, there is not rush to proceed under these circumstances in what would be a very painful, difficult and costly proceeding for all concerned.

I also hope that Ms. Herman was able to see my sincerity a few weeks ago and I thank all of you for your time and serious consideration in dismissing this matter. Simply, put there is no clear and convincing evidence that I did anything wrong. To the contrary, I did my best to help someone, at my time and expense, that I cared about and still empathize with. This is the way I have always been and this why my primary area of practice remains public interest law with an organization which I founded that respects and promotes ethics in the legal profession and government.

Thank you for your courtesy and consideration. I look forward to hearing from you. My cell phone number is 310 595 0800 and my email is leklayman@gmail.com.

Sincerely,

Larry Klayman, Esq.

Klayman Law Group P.A.
7050 Palmetto Park Road
Boca Raton, Florida 33433
(561) 558-5336

BY HAND WITH CASE FILES

December 19, 2016

H. Clay Smith, III  Esq.
OFFICE OF BAR COUNSEL
499 E. Street, N.W.
Building B, Room 228
Washington, D.C. 20001

Re: In re Larry Klayman, Esquire, Docket No. 2011-D028.

Dear Mr. Smith:

I am responding to a complaint, apparently filed with the Office of Bar Counsel (DC Bar Counsel) by an anonymous person on Ms. Elham Sataki's behalf (her written English is far from fluent) on or about October 20, 2011. Until this was brought to my attention by you a few months ago, I was unaware that this document had been filed with Bar Counsel, although I had seen an abbreviated handwritten complaint in Ms. Sataki's "broken English," which I did respond to at the time. However, as reflected on this typewritten complaint prepared and filed by an anonymous person, identical complaints were filed before The Florida Bar and the Pennsylvania Bar, which they summarily dismissed at the time.

These bars had the benefit of my response, which included a copy of a sworn affidavit prepared and filed by Mr. Timothy Shamble, the President of the Local Chapter of the American Federation of Government Employees at the Voice of American (VOA) on February 3, 2012. In this sworn affidavit, which I am submitting herewith with copious documentation and which I believe most of which I also previously submitted to DC Bar Counsel but must have been either misplaced or lost over the years, Mr. Shamble, with whom I worked closely in representing Ms. Sataki with regard to her sexual harassment and work place retaliation claims, Mr. Shamble attests to my and his diligent representation. (Exhibit 1).

What is perplexing and troubling is that this complaint obviously prepared and filed by an anonymous person on Ms. Sataki's behalf is now going on over 6 years old. What also more than troubling is that from the documents thus far provided to me by DC Bar Counsel that a draft specification of charges was prepared and submitted to an expert, Joel Bennett, before I was even informed of the complaint filed on Ms. Sataki's behalf on or about October 20, 2011 and had a chance to respond. This suggests that Bar Counsel had, after about 6 years, and without the benefit of the complete case file and related documentation, prejudged this anonymously prepared and filed complaint for some ulterior purpose.

In this complaint, the anonymous person who wrote and submitted it states at subpart C, wherein it asks, "Have you filed a complaint about this matter anywhere else? If yes, please give details," the anonymous submitter responds "Complaint also filed in Pennsylvania and Florida."

It is important that both bars summarily dismissed the complaint after reviewing documentation showing conclusively that Mr. Shamble and I worked together to file an administration EEO complaint, lobbied congressmen and senators to intervene on Ms. Sataki's behalf to remedy her claims of sexual and work place harassment and retaliation, and I also filed, at her request and authorization, a federal district court action to preserve the so-called "status quo" while the EEO complaint proceeded administratively, by asking the federal district court to put her back to work in her home city of Los Angeles where VOA also has a bureau which broadcasts for the Persian News Network (PNN) away from the alleged harasser in the VOA facility in Washington, D.C.

I am submitting the file of Mr. Shamble with regard to the EEO complaint we pursued diligently as well as the entire case files before the U.S. District Court for the District of Columbia. (Two copies of the EEO and district court case files are being hand delivered with this response.) I now trust that DC Bar Counsel and its expert will thoroughly review these documents, as did the Florida and Pennsylvania Bars, in reaching identical findings that this complaint must now be dismissed. Indeed, this complaint was submitted so long ago – almost 6 years ago – that I had to obtain the EEO file from Mr. Shamble and copy off the pleadings from PACER, as I had only a few documents that remained in the file I kept in storage, which I retrieved at some expense after being informed of the anonymously prepared and filed complaint.

Thus, most of my own files had been discarded many years ago, since it was my understanding based on the dismissals by Florida and Pennsylvania that the matter had been resolved. That is why when DC Bar Counsel contacted me a few months ago, I had thought that the complaint had also been resolved before it. This case is so old that the Florida and Pensylvania bars also purged their files of the simultaneously filed complaint, as are their policies (Florida 5 years, Pennsylvania 2 years.) I am submitting certificates of good standing and disciplinary records of The Florida and Pennsylvania bars that attest to the hard fact that no complaint was pursued and that no discipline thus resulted from either entity. Exhibit 2

In early 2010, Mr. Shamble, who is an expert on EEO complaints, as the union president and representative for VOA employees such as Ms. Sataki, and I undertook representation. As a former trial lawyer for the U.S. Department of Justice, and based on my private practice, I have considerable administrative law and litigation experience and have handled labor cases in the past.

Neither of us was paid for our efforts and since Ms. Sataki was a friend,[1] I represented her pro bono. Not only did I undertake legal representation and in fact tried to settle Ms. Sataki's claims with VOA before any administrative or court action was filed, I also sought the aid of various congressmen and senators, such as Speaker of the House John Boehner, who I introduced Ms. Sataki to and who offered to help her (indeed we visited his office to meet with and  work with his staff after he offered to help), as well as Senators John McCain of Arizona and then Senator from Oklahoma Tom Coburn, whose chief of staff I knew. I lobbied both of them on Ms. Sataki's behalf and Mr. Shamble also liaised with them. Because of the toxic politics at VOA which Mr. Shamble attests to (he testifies in his affidavit that VOA has been ranked the worst agency in government), these early efforts did not bear fruit (the EEO/Shamble file even references obstruction of justice by persons in management at VOA and seeks a referral to the FBI/Justice Department) and thus it was decided, with *Ms. Sataki's specific consent*,[2] that we would also try to publicize her claims to try to pressure and convince VOA to remedy her situation. As anyone with any Washington, D.C. background knows, publicity can frequently be effectively used to try to prod and convince government entities and officials, who are sensitive to criticism, to agree to settle matters.

When the lobbying, EEO administrative action and federal court cases did not provide immediate relief, Ms. Sataki became despondent. Indeed, she had been suffering significant psychological problems and for this reason I even paid for her psychological counseling with two psychologists one of which was Dr. Arlene Aviera (See Shamble/EEO file and district court case files) and her housing in Los Angeles as she awaited the results of our legal and related efforts to remedy her situation. When her case became longer, extremely time- consuming and more complex and Ms. Sataki  became more difficult, and she became harder to communicate with and demanding of my efforts as a lawyer and friend, I suggested that I would take her up

---

[1]        I notice the draft complaint you sent me makes the surprising claim that I "announced" to Ms. Sataki that I wanted a romantic relationship with her and she declined my "entreaties." Let me make this clear: that is false! I did not pursue her; I never kissed her on the lips; I never even walked down the street with her holding hands. I never tried to do any of those things. Perhaps she imagines that people are sexually coming on to her when they are not. Please see below, where I learned after she was no longer a client that she often claims sexual harassment.  Or, perhaps, she is just lying.  Ironically, even her complaint of October 20, 2011 does not claim that I sexually harassed her and no sexual harassment complaint, after nearly 6 years, as well as any legal malpractice case was ever filed against me. The bars Florida and Pennsylvania obviously saw no sexual harassment or other untoward sexual behavior or legal malpractice either.

[2]        She never said that she wanted the case to be pursued quietly.  She told me she wanted publicity for her case. She is an activist and her family was prominent in the inner circle of the now deposed and diseased Shah of Iran. Ironically, her previous post as a co-host at VOA was quite public and she understood the value of publicity to get a hoped for good result given the intransigence of VOA management to amicably resolve the matter, which we had hoped for and had attempted in settlement discussions before any EEO and federal court legal proceedings were filed and pursued.

on her initial proposal to compensate me with a contingent fee. We did not convert her proposal to writing because, shortly after that, she told her VOA Union Representative, Mr. Shamble and me to drop her cases, and also apparently wrote to VOA in this regard about her EEO case. Hence, the legal relationship ended before a written agreement could be reached on pursuing a timely court action after her administrative EEO complaint was not successful. In this regard, as the submitted documents show, both Mr. Shamble and I both tried to reach her on various occasions so we could proceed on her behalf, but she was non-communicative with either of us.

At the time, I was contacted by cell phone, likely by the anonymous person who prepared and filed the complaint dated October 20, 2011. This person left a threatening and hostile voicemail that said that if Mr. Shamble and I did not stop trying to contact her that she would file a bar complaint. This person left no number and the caller ID was blocked so I could not return it. Because of the passage of time I no longer have this voicemail and or the cell phone on which it was recorded, and this evidence has apparently been lost or discarded.

Because I did not know who this anonymous person was and if he indeed was even speaking for Ms. Sataki, I had to spend my time and my own money to appeal the federal district court action. Recall that neither her Union Representative nor I could not contact Ms. Sataki because she was uncommunicative. Finally, later Mr. Shamble and I did finally receive correspondence from Ms. Sataki to not undertake anymore legal and other efforts on her behalf, and we obeyed these instructions promptly.

Now, nearly six years later, however, based on recent emails (in broken-English) to DC Bar Counsel, she belatedly inquires of you whether she can still pursue her VOA sexual harassment claims. This speaks to the lack of merit in her assertions that Mr. Shamble and I did not diligently and competently and in good faith previously represent her interests, before she told us both to quit. At this late date, after ordering us to cease representation, she cannot complain that her Union Representative and I did not diligently represent her interests but instead she asks DC Bar counsel to advise and perhaps incredibly suggest that DC Bar Counsel should now represent her in her sexual harassment and work place claims. Ironically, the complaint of October 20, 2011 refers to multiple harassment claims at VOA.

Regrettably, Ms. Sataki, as I have seen and experienced with other victim clients over my nearly 40 years of being a lawyer, continues to suffer from what is in effect a "victim's syndrome," where they feel that the entire world is against them and strike out to blame the people who did the most to help them. Thus, the old adage that no good deed goes unpunished.

In this regard, after I ceased representing her, I also confirmed from sources who came forward that her claims against VOA were only the latest in a series of similar claims of sexual harassment and work place retaliation. (Over time it became apparent to me that Ms. Sataki herself, as well as others who know her, sees sexual harassment around "every corner. I can divulge more information about this if she will now waive attorney client privilege.)

And, her recent emails to you reflect that she is now wants to "reopen" this bar complaint to explain and "justify" to prospective employers why she is no longer, after all this time, not working as a broadcaster for VOA. This is not a valid reason for her now, after nearly 6 years, to take an interest in the anonymously prepared and submitted complaint of October 20, 2011, which has long ago been summarily dismissed by Florida and Pennsylvania, but which has apparently languished in the files of DC Bar Counsel for almost 6 years. See enclosed letter from ethics expert and professor Ronald Rotunda. Exhibit 3.

Finally, I was shocked to learn that D.C. Bar Counsel prepared a draft specification of charges before I was even notified that it was considering a six-year old complaint, which raises the specter of retaliation given the pending status of another case involving Judicial Watch. Nonetheless, I am prepared, if necessary, to respond in more detail to the incorrect recitations of allegations in the draft specifications of charges. In the interim, I respectfully suggest that DC Bar Counsel and its expert review the copious pleadings and other materials I am providing with this response, as DC Bar did not have the benefit of this copious documentation and other materials when, for whatever reason, it incredibly prejudged, "jumped the gun," and prepared the draft specification of charges.

Thank you in advance for your unbiased and impartial consideration. I respectfully ask you to dismiss this six-year-old complaint.

Sincerely,

Larry Klayman, Esq.

cc:  Professor and Ethics Expert Ronald Rotunda, Esq.


Attachments:

Exhibit 1 – Sworn Affidavit of Labor and EEO Expert and VOA Union President Timothy Shamble
Exhibit 2 – Certificates of Good Standing and Disciplinary Records of Pennsylvania and Florida
         Demonstrating that Sataki Complaints Were Long Since Dismissed
Exhibit 3 – Letter from Ronald Rotunda, Esq.

Also provided and delivered herewith are two boxed copies each of EEO/Shamble Union President Case file and case files of the U.S. District Court for the District of Columbia in 1:10-cv-00534 – CKK and 1:10-cv-00466.

CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

One University Drive
Orange, California 92866
www.chapman.edu

Ronald D. Rotunda
*The Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

RE: Bar Complaint of Oct. 20, 2011
VIA: Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1] "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts, and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. *The facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct.* Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, , Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

[2] Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3] Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

4 http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

5 http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph, id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke,* 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6] *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

> In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

---

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7] I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8] Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

Declaration of Timothy Shamble

I, Timothy Shamble, President of the Local Chapter of the American Federation of Government Employees at the Voice of American hereby attest as follows:

1. I am the union representative who was consulted by Elham Sataki and her counsel Larry Klayman with regard to Ms. Sataki's claims of workplace sexual harassment and workplace retaliation at the Persian News Network of Voice of America (VOA).

2. Larry Klayman consulted with me during the time he was working on her case.

3. I found, Mr. Klayman to be very diligent in attempting to zealously represent Ms. Sataki – putting in many hours -- and did not, to my knowledge, compromise any of her rights. However, communication became very difficult and nearly non-existent with Ms. Sataki – perhaps due to her health condition. When Mr. Klayman and I would try to contact her we usually got no response, even for months. During these periods, Mr. Klayman attempted to protect Ms. Sataki's rights so that they would not be forfeited. It is my opinion that Mr. Klayman acted professionally and ethically in trying to protect Ms. Sataki's rights even after she would not communicate with him.

4. I have given Mr. Klayman's name and contact information to at least one other aggrieved VOA employee when they requested the name of an aggressive attorney. I was impressed by his willingness to doggedly defend Ms. Sataki under difficult circumstances. The Broadcasting Board of Governors (of which VOA is a subcomponent) has been ranked the worst agency in government, and it is very difficult to negotiate any settlement with them because of management's attitude and approach to employees.

5. It did not appear to me that Mr. Klayman was representing Ms. Sataki to promote his interests, rather than Ms. Sataki's. He appeared to me to be very dedicated to her interests and I was aware that public relations avenues were used to try to prod VOA into a settlement.

6. If you need further information, please feel free to contact me at 202-382-7613.

Timothy Shamble

02/03/12

SUPPLEMENTAL DECLARATION OF TIM SHAMBLE

My name is Timothy Shamble and I am the president of the American Federation of Government Employees, Local 1812 which represents the broadcasters and journalists at the Voice of America (VOA), and hereby attest to the following information:

1. I sat in and was present at, at least, one meeting with Larry Klayman and Elham Sataki where using public relations such as press articles and news stories to describe and publicize the alleged sexual and workplace harassment of Elham at VOA was discussed. Indeed, the idea was that public relations could help push the agency into a settlement or resolution of Elham's claims especially since the VOA had been consistently ranked as one of the worst agencies in the federal government according to the OPM.
2. In this regard, attached is an email between Larry Klayman, Elham and two other broadcasters of VOA, who Larry Klayman was also seeking to help – as they too along with others in the Persian News Network branch of VOA believed that they were experiencing work place harassment of various sorts -- about an interview with the Los Angeles Times.
3. The understanding was that this public relations strategy, including interviews and articles, might also serve to convince congressmen on Capitol Hill to step in and help Elham settle or resolve her claims with VOA. In this regard, Larry Klayman asked me to accompany him to the offices of congressmen on Capitol Hill to make the case for them to help Elham and some others at VOA in the Persian News Network that were subject to alleged sexual and/or workplace harassment. At, at least one event, we handed out a flyer about Elham's alleged claims to get support for her and pressure the VOA to reach a beneficial settlement. VOA management is generally non-responsive to amicably resolving such issues.
4. Public relations can influence entities such as VOA and congressmen to take positive action, as the press can be very influential in this regard. It was my impression that Elham understood this and approved it.
5. As a broadcaster and TV anchor, I believed that Elham understood the benefit of public relations. I am not aware that any public relations about Elham's situation were anything but positive and complimentary about her.

I swear that the above is true and correct to the best of my recollection.

Timothy Shamble

07/09/17

Date

SWORN DECLARTION OF KEYA DASH

I, Keya Dash, being over eighteen years of age, hereby attest as follows to the best of my personal knowledge and belief:

1. I have personal knowledge of Mr. Larry Klayman's efforts to represent Elham Sataki with regard to her claims of sexual harassment at Voice of America. I am a businessman who lives and works in the Washington, D.C. area and I have known Larry Klayman for many years. While I am not a lawyer, I have a lot of experience with legal matters and cases as a result of my own and may family's own professional experiences, as my family have been involved in the past in owning mens' clothing stores (Dash's Designers menswear) and commercial real estate.
2. Mr. Klayman asked me as a friend to try to assist Ms. Sataki, as I have a family member who works at VOA and Larry was attempting to settle the sexual harassment claims with VOA before having to file an EEO complaint and federal court litigation.
3. As VOA is a very difficult government organization, these efforts proved unsuccessful. As a result, I am aware and was present when Larry, with Ms. Sataki present, even asked former Speaker of the House John Boehner to intervene on Ms. Sataki's behalf. In this regard, Speaker Boehner offered to help and I am aware that Larry and Ms. Sataki later met with his staff in the Capitol building in this regard. I am aware that Speaker Boehner's efforts proved unsuccessful. I am also aware that Larry lobbied others on Capital Hill for help, as VOA management was intransigent agreeing to allow Ms. Sataki to transfer to the Los Angeles office and settle the case in general.
4. I am also aware of Larry's other considerable legal efforts in court on behalf of Ms. Sataki.
5. I have known Mr. Klayman for many years and consider him a friend and have consulted with him with regard to my own legal matters. I know him from personal experience to be extremely ethical and a fine and diligent lawyer. In this regard, as Ms. Sataki is Persian and I am too, I am aware of Larry's reputation in the Persian community and it is excellent. In this regard, he has helped several people of Persian descent at VOA and elsewhere, including Ms. Sataki, and at all times I am aware that he acted professionally and ethically. With regard to Ms. Sataki I was present with Larry and Ms. Sataki to discuss her case on more than one occasion and I observed that he always treated her with respect and was not in any way involved in a romantic relationship with her, and nor did he seek one. He was helping her as a friend and as someone who believed at the time that she needed strong legal assistance.
6. Given what I know about VOA and its Persian News Network, the use of publicity to try to "coax" the managers into a settlement of Ms. Sataki's claims was a prudent strategy and I am aware from having been in Ms. Sataki's presence when her case was discussed that she approved of it.

7. Thus, in my opinion, Larry represented Ms. Sataki in a professional manner to the best of his ability.

I hereby swear that the foregoing is true and correct under penalty of perjury.

Keya Dash

12/20/16
Date

 **Oliver Peer <oliver.peerfw@gmail.com>**

# Fwd: WRITTEN RECORD OF WHAT JUST JUST HAPPENED IN YOUR OFFICE

**Larry Klayman** <leklayman@gmail.com> Wed, May 16, 2018 at 10:32 AM
To: Oliver Peer <oliver.peerfw@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Fri, May 11, 2018 at 8:10 AM
Subject: WRITTEN RECORD OF WHAT JUST JUST HAPPENED IN YOUR OFFICE
To: Phil Fox <FoxP@dcodc.org>, Clay Smith <smithc@dcodc.org>, "Elizabeth A. Herman" <HermanE@dcodc.org>, "Julia L. Porter" <PorterJ@dcobc.org>, Andrea de la Torre <delatorrea@dcodc.org>
Cc: leklayman <leklayman@gmail.com>

Mr. Fox:

This morning, as previously scheduled for today at 10 am, I came to Office of Bar Counsel, in good faith, to discuss, show you and allow you to listen to the evidence of unprofessional, unethical and illegal conduct of you and your staff, including but not limited to the above listed recipients of this email. I had written in emails previously I would provide the professional courtesy to you and your staff which had not been afforded to me before the Sataki specification of charges was presented to a Board member to sign off on, and thus institute the Sataki case.

At 10:00 o'clock this morning, I thus came to Office of Bar Counsel, and you came out to the reception to lead me into yor office, where I unexpectedly found Ms. Julia Porter and your described investigator Kevin O'Connor, who you had not advised me in advance. would be present.

You then abruptly, arrogantly and belligerently proceeded to tell me that you and your staff were not going to hear anything about why the Sataki and related matters were wrongly brought and pursued; only that I was to show you and Ms. Porter and Mr. O'Connor what evidence I had.

Hearing your hostility and seeing your animus before we even began, I then stated that I would not be dictated to as to what I could discuss.

You then, in front of Ms. Porter and Mr. O'Connor, got up quickly in a threatening manner and with a terse high pitched and loud loud voice screamed that "this meeting is over" and "that I should leave your office."

As I got up to leave, I calmly, despite having being pushed out the door to your office, responded by stating that this left me no choice but to file bar disciplinary grievances and a court complaint against you and your staff.

You then, with a grimace and showing more animus toward me, confirmed what I had perceived before, by yourself nearly yelling that "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law." This more than confirms your motivations, as previously expressed in writing you and your staff, that the mission of Bar Disciplinary Counsel is to remove me from the practice of law, by whatever unprofessional, unethical and illegal means you decide are can be used "justify" these ends.

It clear that my politics and gender have a lot to do with this during there very polarized time. Indeed, among many other indicia, you and others on your staff have supported and donated heavily to government officials that in my public interest capacity at Judicial Watch and now Freedom WatchI have brought suit and pursued other legal actions against in the public interest.

The evidence that I had intended to show and allow you to listen to , among a large amount of other evidence, are conversations recorded by audio in the Office of Bar Counsel while I was previously meeting in this office with you and your staff, which itself more than supports my allegations of unprofessional, ethical and illegal conduct by you and your staff.

Please govern yourself accordingly.

Larry Klayman



# OFFICE OF DISCIPLINARY COUNSEL

October 12, 2017

Hamilton P. Fox, III
*Disciplinary Counsel*

Elizabeth A. Herman
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jennifer P. Lyman
Julia L. Porter

*Assistant Disciplinary Counsel*
Joseph N. Bowman
Caroll G. Donayre
Gayle Marie Brown Driver
Jerri U. Dunston
Jelani C. Lowery
Becky Neal
Dolores Dorsainvil Nicolas
Sean P. O'Brien
Joseph C. Perry
William R. Ross
Clinton R. Shaw, Jr.
H. Clay Smith, III
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom
Hendrik deBoer

*Manager, Forensic Investigations*
Charles M. Anderson

*Senior Forensic Investigator*
Kevin E. O'Connell

***CONFIDENTIAL***

Larry E. Klayman, Esquire
2020 Pennsylvania Ave., NW, Suite 345
Washington, DC 20006

**Re: Orfanedes/Klayman**
**Undocketed No. 2017-U353**

Dear Mr. Klayman:

We have completed our review of the disciplinary complaint that you filed against Paul J. Orfanedes, Esquire. You state that Mr. Orfanedes serves as Chief Legal Counsel for Judicial Watch, Inc. ("Judicial Watch"). Mr. Orfanedes also serves on the Board of Directors for Judicial Watch ("the Board").

You state that when Judicial Watch began accepting donations for a new building in 2003, the donors expected to receive certain naming benefits referencing their donation. To date, the new building has not been constructed. You claim that Mr. Orfanedes, along with the Board, committed fraud, dishonesty and misappropriation by failing to use the donated funds for their intended purpose. You further state that such failure "rises even to the level of criminality." You have requested a full investigation into these allegations.

We decline to open a full investigation of this matter. Your complaint raises the mishandling of donated funds, given by the supporters of Judicial Watch for the construction of a new building. A dispute over whether Judicial Watch misused the donated funds is civil in nature.

Accordingly, we decline to further investigate this matter and have closed our file. If a civil suit causes a court to make findings of dishonesty or fraud, you are free to re-contact this office.

Sincerely,

Elizabeth A. Herman
Deputy Disciplinary Counsel

EAH:AW

 **Oliver Peer <oliver.peerfw@gmail.com>**

## Fwd: FW: 2017-U353 Klayman

**Larry Klayman** <leklayman@gmail.com> Wed, May 16, 2018 at 5:15 PM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ----------
From: **Elizabeth A. Herman** <HermanE@dcodc.org>
Date: Fri, May 4, 2018 at 6:37 AM
Subject: FW: 2017-U353 Klayman
To: Larry Klayman <leklayman@gmail.com>

Mr. Klayman: Attached is the decline letter previously sent to you, as you requested. We did not request or receive a response from the attorneys because this case was not opened for a full investigation.

Elizabeth A. Herman

Deputy Disciplinary Counsel

**2017-U353 Decline Ltr 10-12-17.pdf**
540K





# OFFICE OF DISCIPLINARY COUNSEL

September 18, 2017

amilton P. Fox, III
Disciplinary Counsel

izabeth A. Herman
Deputy Disciplinary Counsel

nior Assistant Disciplinary Counsel
nnifer P. Lyman
lia L. Porter

Assistant Disciplinary Counsel
seph N. Bowman
rroll G. Donayre
ayle Marie Brown Driver
lani C. Lowery
ecky Neal
olores Dorsainvil Nicolas
an P. O'Brien
seph C. Perry
illiam R. Ross
inton R. Shaw, Jr.
Clay Smith, III
aci M. Tait

nior Staff Attorney
awrence K. Bloom
endrik deBoer

anager, Forensic Investigations
arles M. Anderson

nior Forensic Investigator
evin E. O'Connell

***CONFIDENTIAL***

Larry E. Klayman, Esquire
2020 Pennsylvania Ave., NW, Suite 345
Washington, DC 20008

**Re: Orfanedes/Klayman**
**Undocketed No. 2017-U353**

Dear Mr. Klayman:

This office is in receipt of the disciplinary complaint that you filed against Paul J. Orfanedes, Esquire, dated August 31, 2017, which our office received September 6, 2017. We will write to you again after our preliminary inquiry into this matter.

If you have a question regarding this matter, please contact Angela Walker at (202) 638-1501. Please refer to the above-referenced undocketed number in all correspondence and telephone calls.

Sincerely,

Elizabeth A. Herman
Deputy Disciplinary Counsel

EAH:AW

SEP 18 2017

OFFICE OF DISCIPLINARY COUNSEL

*515 5th Street, N.W., Building A, Room 117*
*Washington, DC 20001*

**PERSONAL AND CONFIDENTIAL**

Larry E. Klayman, Esquire
2020 Pennsylvania Ave., NW, Suite 345
Washington, DC 20006



# OFFICE OF BAR COUNSEL

July 7, 2011

SCANNED
JUL - 7 2011

Wallace E. Shipp, Jr.
*Bar Counsel*

Elizabeth A. Herman
*Deputy Bar Counsel*

*Senior Assistant Bar Counsel*
Judith Hethertan
Julia L. Porter

*Assistant Bar Counsel*
Joseph N. Bowman
Ross T. Dicker
Gayle Marie Brown Driver
Hamilton P. Fox, III
Catherine L. Kello
Becky Neal
William Ross
H. Clay Smith, III
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom
Dolores Dorsainvil
Joseph C. Perry
Mary-Helen Perry

**CONFIDENTIAL**

Ms. Elham Sataki
16110 Ventura Boulevard
Encino, California 91436

Re: Klayman/Sataki
Bar Docket No. 2011-D028
Response due: July 15, 2011

Dear Ms. Sataki:

Enclosed is a copy of the attorney's answer to your complaint in the above-referenced matter.

If you disagree with any of the statements made by the attorney, or if you have any additional evidence, please provide us with your written reply on or before July 15, 2011.

If we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations. If you have a question or need assistance in preparing your response, please call the undersigned at (202) 638-1501. Please refer to the above docket number in all correspondence and telephone calls.

Sincerely,

H. Clay Smith
Assistant Bar Counsel

Enclosure

HCS:act

*Serving the District of Columbia Court of Appeals and its Board on Professional Responsibility*
*515 5th Street NW, Building A, Room 117, Washington, DC 20001 ■ 202-638-1501, FAX 202-638-0862*

**Clay Smith**

**From:** Kevin O'Connell
**Sent:** Thursday, January 16, 2014 9:47 AM
**To:** Clay Smith; Chuck Anderson
**Subject:** RE: Project

Stand by......

**From:** Clay Smith
**Sent:** Wednesday, January 15, 2014 3:10 PM
**To:** Chuck Anderson; Kevin O'Connell
**Subject:** Project

Gentlemen:

I am trying to locate a complainant that has dropped off the map.

Ms. Elham Sataki
16110 Ventura Blvd.
Encino, CA 91436
(818) 800-1441

She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number above is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

Thanks,

H. Clay Smith, III
Assistant Bar Counsel
Office of Bar Counsel
515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

(202) 638-1501

**Clay Smith**

**From:** Kevin O'Connell
**Sent:** Thursday, January 16, 2014 10:11 AM
**To:** Clay Smith
**Subject:** FW: Klayman/Sataki; Bar Docket No. 2011-D028

Just sent this....the AOL address bounced back but the Yahoo did not.

**From:** Kevin O'Connell
**Sent:** Thursday, January 16, 2014 10:08 AM
**To:** 'Elliesataki@yahoo.com'; 'esataki@aol.com'
**Subject:** Klayman/Sataki; Bar Docket No. 2011-D028

Ms. Sataki:

Assistant Bar Counsel Clay Smith is trying to reach you regarding the complaint you made to our office in 2011 concerning attorney Larry Klayman.

Can you please provide me with your current contact information(home and cell phones and home address).

Thank you.

Kevin E. O'Connell
Forensic Investigator
Office of Bar Counsel
Board on Professional Responsibility
District of Columbia Court of Appeals
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
Main: (202) 638-1501
Direct: (202) 454-1718
Fax: (202) 638-0862



# EXHIBIT 2

KLAYMAN LAW GROUP
A PROFESSIONAL ASSOCIATION
Larry Klayman, Esq.
2020 Pennsylvania Ave. N.W., #800
Washington, DC, 20006
Tel: 310-595-0800
Fax: 202-379-9289

***Via Federal Express and Email***

June 6, 2018 **URGENT AND FOR IMMEDIATE CONSIDERATION**

Robert C. Bernius, Esq.
Chair
Board on Professional Responsibility
430 E Street NW
Suite 138
Washington, DC, 20001

**Board Docket No. 17- BD-063**
**Bar Docket No. 2011-D028**

**Re: Review of Unprofessional and Unethical Conduct by Bar Disciplinary Counsel**

Dear Mr. Bernius:

I have received and reviewed your letter of yesterday, June 5, 2018 (attached) claiming immunity for the alleged unprofessional and unethical acts of Bar Disciplinary Counsel and Deputy Bar Counsels Elizabeth Herman and Julia Porter, as well as those of Assistant Bar Counsel H. Clay Smith III, all of whom acted and continue to act in concert in unprofessional and unethical prosecutorial misconduct.

Given this position, with which I respectfully disagree with particularly given that these putative respondents have also violated my constitutional rights and thus have lost any even arguable claim of immunity, please advise me as soon as possible how the Board of Professional Responsibility otherwise internally addresses and remedies unprofessional and unethical prosecutorial misconduct by its so called prosecutors.

Even assuming immunity from bar disciplinary grievances, one would have to believe that there is some mechanism for the Board to address unprofessional and unethical conduct by Bar Disciplinary Counsel prosecutors and staff. For instance, the U.S. Department of Justice ("DOJ") routinely conducts internal investigations and metes out discipline for its prosecutors who have engaged in unethical and illegal prosecutorial misconduct. As you know, the offices of DOJ which conduct these investigations and mete out discipline are the Office of Professional Responsibility and the Office of the Inspector General. Incidentally, I am an alumnus of DOJ, having served as a trial attorney in the Antitrust Division as a young lawyer.

Clearly, the Board must have an equivalent mechanism to address unethical and unprofessional prosecutorial misconduct by its prosecutors in the Office of Bar Disciplinary Counsel. The Board

clearly cannot and should not hold them to a different ethical standard than it holds other members of the District of Columbia Bar.

I thus would like to know how the Board intends to address the alleged unprofessional and unethical prosecutorial conduct set forth in my complaints, which misconduct is continuing and is becoming more pronounced and severe, as I will set forth in supplemental correspondence. I am attaching my previous bar grievances against the putative respondents in case that they were not provided to you by Bar Disciplinary Counsel, who has not acted honestly and ethically toward me.

A review of my grievances will show the gravity of my serious allegations. Importantly, one severe area of my grievance is that Bar Disciplinary Counsel is attempting to unethically subvert a previous finding which you and other Board Members made in the Judicial Watch matter (Bar Docket No. 2008 D048) where you corrected factual errors by the hearing committee and recommended that its reinstatement recommendation be removed.

Clearly you can not be suggesting that the putative respondents of Bar Disciplinary Counsel are "above ethics and the law" and that there is no mechanism to investigate and remedy their misconduct. Otherwise the very raison d'etre for the Board would be nullified and subverted, which is to protect all members of the bar and their clients, in holding all lawyers to the strictures of the Code of Professional Responsibility of the District of Columbia Bar. In this regard, your website represents:

> In this capacity, the Office of Disciplinary Counsel has a dual function: to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints.

Thank you for your immediate response as time is of the essence.

Sincerely,

Larry Klayman, Esq.

cc. Hamilton Fox, Esq
Elizabeth Herman, Esq.
Julia Porter, Esq.
H. Clay Smith III Esq.
Office of Bar Disciplinary Counsel

KLAYMAN LAW GROUP
A PROFESSIONAL ASSOCIATION
Larry Klayman, Esq.
2020 Pennsylvania Ave. N.W., #800
Washington, DC, 20006
Tel: 310-595-0800
Fax: 202-379-9289

***Via Federal Express and Email***

June 7, 2018

**URGENT AND FOR IMMEDIATE CONSIDERATION**

Robert C. Bernius, Esq.
Chair
Board on Professional Responsibility
430 E Street NW
Suite 138
Washington, DC, 20001

**Board Docket No. 17- BD-063**
**Bar Docket No. 2011-D028**

**Re: Supplement to Letter of June 6, 2018 Concerning Requesting Expedited Internal Review of Unprofessional and Unethical Prosecutorial and Other Illegal Misconduct of Bar Disciplinary Counsel Hamilton Fox, Deputy Bar Disciplinary Counsels Elizabeth Herman and Julia Porter, and Assistant Bar Disciplinary Counsel H. Clay Smith III and Related Matters**

Dear Mr. Bernius:

This supplements the above referenced letter to you of yesterday, June 6, 2018, for which I have respectfully requested an expeditious response.

Rule 8.3 – Reporting Professional Misconduct of the District of Columbia Rules of Professional Conduct provides:

> (a) A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate professional authority.
> (b) A lawyer who knows that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority.
> (c) This rule does not require disclosure of information otherwise protected by Rule 1.6 or other law.

This is exactly what I have done in coming forward with substantial evidence of unprofessional and unethical, and in many respects, illegal, conduct by Bar Disciplinary Counsel, his deputies and an assistant, all of whom have subverted and violated the independent role of their office by acting

unprofessionally, unethically and illegally. This presumes that when a substantial question of misconduct is reported, it will be investigated by the bar.

As I set forth in the ethics complaints which I previously filed, but for which you claim that these lawyers have immunity, the putative respondents have even sought to unethically nullify and subvert finding which you recently made in *In re: Larry Klayman, Esq.* (Bar Docket No. 2008 D048) through false statements and improper actions, designed to harm me. Their admissions, which I have on audio recordings, that they also "do not like the way I practice law," meaning my politics and advocacy at Judicial Watch and now Freedom Watch, both of which I founded, as well as their equally unconstitutional gender and First Amendment based discrimination and denial of due process and equal protection, speak for itself. It is not the province of Bar Disciplinary Counsel to tell me how to practice law, only to investigate whether I have violated, with clear and convincing evidence, the District of Columbia Rules of Professional Conduct.

To add insult to injury, as I have demonstrated, it is not "yours truly" who has violated the bar's norms and rules for professional conduct, but the putative respondents who have done so.

Recently, in the on-going hearing of the Sataki case (Board Docket No. 17-BD-063, Bar Docket No. 2011-D028), they have withheld material evidence and suborned perjury by the complainant, as just few examples of their illegal and unethical conduct. I respectfully request a meeting with you at your earliest convenience to detail this and other on-going severe prosecutorial misconduct.

In this regard, I have prepared a civil complaint setting forth constitutional due process, equal protection and First Amendment violations, and other actionable misconduct, including Title 7, 42 U.S.C. § 2000e, et seq., counts for gender discrimination, as well as abuse of process, and am prepared to file and serve it. The bar's general counsel has agreed to accept service of this complaint which I had intended to file no later than today. There can be no "immunity" for constitutional and these related violations, in particular.

However, to show my continued respect for you and the Board, I will hold off for a few days with the hope that you will rightly commit to commence, at a minimum, an independent and neutral investigation with non-conflicted investigators, of the gross prosecutorial misconduct which I have alleged. In this regard, I propose and respectfully request that you and the Board proceed expeditiously, and I am prepared to meet with you and responsible independent non-conflicted persons next week or at the earliest, and in the interim move to put the on-going hearing in the Sataki case on hold, that is to move to stay it, until the Board's internal review is conducted and completed.

When we meet, I will play the audio recordings and provide additional compelling evidence to the investigators. The audio recordings were performed in one party consent jurisdictions as I understood at the time how Bar Disciplinary Counsel were proceeding to attempt to remove me from the practice of law in violation of ethics rules and the law.

I prefer not to have to file suit, if you and the Board will in the next two days commence a bona fide internal review. As I observed yesterday, there has to be a mechanism to review the prosecutorial misconduct of Bar Disciplinary Counsel, as it is not "above the same ethics and law"

that they are empowered to investigate and if clear and convincing evidence is found enforce against other members of the bar. This is what Rule 8.3 clearly stands for; equal justice under the rules of ethics and the law, as it correctly mandates appropriate reporting of unethical and illegal misconduct by lawyers, no matter who is at issue, even Bar Disciplinary Counsel and his staff.

Bar Disciplinary Counsel are lawyers licensed in this jurisdiction and cannot and should not be treated as if they cannot be held to account.  You and the Board thus have a sacrosanct duty and professional responsibility to investigate and if necessary mete our discipline fairly, based on the facts and the law, no matter who is at issue.

Please respond to this letter and yesterday's letter in the by cob tomorrow, as I must decide whether or not to file suit, as I would have no other legal recourse if a fair, independent and non-conflicted internal review is not undertaken forthwith, as the serious harm to me is continuing.

Thank you for your expeditious consideration.

Sincerely,

Larry Klayman, Esq.

cc. Hamilton Fox, Esq
    Elizabeth Herman, Esq.
    Julia Porter, Esq.
    H. Clay Smith III Esq.
    Office of Bar Disciplinary Counsel

KLAYMAN LAW GROUP
A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.
2020 Pennsylvania Ave. N.W., #800
Washington, DC, 20006
Tel: 310-595-0800
Fax: 202-379-9289

***Via Federal Express and Email***

June 8, 2018

**URGENT AND FOR IMMEDIATE CONSIDERATION**

Robert C. Bernius, Esq.
Chair
Board on Professional Responsibility
430 E Street NW
Suite 138
Washington, DC, 20001

**Board Docket No. 17- BD-063**
**Bar Docket No. 2011-D028**

**Re: Second Supplement to Letter of June 6, 2018 Concerning Requesting Expedited Internal Review of Unprofessional and Unethical Prosecutorial and Other Misconduct of Bar Disciplinary Counsel Hamilton Fox, Deputy Bar Disciplinary Counsels Elizabeth Herman and Julia Porter, and Assistant Bar Disciplinary Counsel H. Clay Smith III and Related Matters**

Dear Mr. Bernius:

Further to my correspondence of June 6 and 7 2018, it is clear that you have the authority to investigate the alleged unethical and illegal prosecutorial misconduct of Bar Disciplinary Counsel.

For example, Section 4(e), of Bar Rule XI provides unequivocally:

> The Board shall have the power and duty… To appoint Disciplinary Counsel, Special Disciplinary Counsel, and such assistant disciplinary counsel and staff as may be required to perform the duties and functions of that office (see section 6), and to fix their compensation. Disciplinary Counsel shall serve at the pleasure of the Board, subject to the Court's oversight authority over all disciplinary matters. Any Special Disciplinary Counsel and all assistant disciplinary counsel shall serve at the pleasure of the Board. As used hereafter in this rule, the term "Disciplinary Counsel" shall refer collectively to Disciplinary Counsel, any Special Disciplinary Counsel, and all assistant disciplinary counsel unless the context requires otherwise.

I look forward to receiving your affirmative response to my request later today.

Sincerely,

Larry Klayman, Esq.

cc. Hamilton Fox, Esq
    Elizabeth Herman, Esq.
    Julia Porter, Esq.
    H. Clay Smith III Esq.
    Office of Bar Disciplinary Counsel

KLAYMAN LAW GROUP
A PROFESSIONAL ASSOCIATION
Larry Klayman, Esq. 2020 Pennsylvania Ave. N.W., #800 Washington, DC, 20006 Tel: 310-595-0800 Fax: 202-379-9289

***Via Federal Express and Email***

June 8, 2018 **URGENT AND FOR IMMEDIATE CONSIDERATION**

Robert C. Bernius, Esq.
Chair
Board on Professional Responsibility
430 E Street NW
Suite 138
Washington, DC, 20001

**Board Docket No. 17- BD-063**
**Bar Docket No. 2011-D028**

**Re: Third Supplement to Letter of June 6, 2018 Concerning Requesting Expedited Internal Review of Unprofessional and Unethical Prosecutorial and Other Misconduct of Bar Disciplinary Counsel Hamilton Fox, Deputy Bar Disciplinary Counsels Elizabeth Herman and Julia Porter, and Assistant Bar Disciplinary Counsel H. Clay Smith III and Related Matters**

Dear Mr. Bernius:

Your response to my letters of June 6, 7 and today, after you claimed in blanket fashion that Office of Bar Disciplinary Counsel ("ODC") and its prosecutors in your letter of June 5, 2018 are immune from ethics complaints, is disappointing and unfortunate.

The crux of your response today is that I am asking for an internal review of only the Sataki case. Apparently, you did not read the ethics complaints which I had filed with ODC and also sent to you for review. My complaints go to a course of conduct in the Sataki and other enumerated proceedings, unethically designed to try to remove me from the practice of law based on my politics, public advocacy and gender. I set forth in excruciating detail the specifics of the prosecutorial misconduct and rank dishonesty.

With all due respect, your response today is disingenuous and creates the appearance, along with your previous letter which failed to advise me of the bar's internal review procedures, of protecting ODC and its named prosecutors.

As the harm inflicted on me is continuing, as is the unethical and illegal conduct at issue, I have no choice but to now file suit. This is regrettable, as I have tried to have this matter dealt with by you and the Board, rather than in court. But now I have no other avenue of relief and must do what

is necessary to ironically not only seek redress for myself, but to uphold the high standards that ODC is uncharged to enforce with it comes to professional ethics and responsibility.


Sincerely,


Larry Klayman, Esq.

cc. Hamilton Fox, Esq
    Elizabeth Herman, Esq.
    Julia Porter, Esq.
    H. Clay Smith III Esq.
    Office of Bar Disciplinary Counsel

 **Oliver Peer <oliver.peerfw@gmail.com>**

# Ethics Complaint and Supplements

**Larry Klayman** <leklayman@gmail.com> Tue, Jun 12, 2018 at 2:50 PM
To: "Paz, Marlon" <paz@sewkis.com>
Cc: Phil Fox <FoxP@dcodc.org>, "Elizabeth A. Herman" <HermanE@dcodc.org>, "Julia L. Porter" <PorterJ@dcobc.org>, "Julia L. Porter" <porterj@dcodc.org>, Clay Smith <smithc@dcodc.org>, Frederick Sujat <fsujat@yahoo.com>, Oliver Peer <oliver.peerfw@gmail.com>

Dear Mr. Paz:

Thank for returning my call this morning. As discussed, I am sending you the ethics complaints which I attempted to have filed and processed by Bar Disciplinary Counsel, but were instead rejected in order to shield Mr. Fox, Ms. Herman, Ms. Porter and Mr. Smith from having to adhere to the same ethics requirements the other ordinary members are held to.

As the general counsel for the bar, you have a duty and responsibility to objectively review the attached materials, as they show flagrant and gross ethics violations by Bar Disciplinary Counsel and lawyers on his staff in violation of the Rules of Professional Responsibility. These ethics violations cannot and should not go unaddressed as part of an apparent cover-up of prosecutorial misconduct in more than one proceeding.

After ODC refused to process my ethics complaints, in good faith I attempted to have this matter internally reviewed, as you will see from my correspondence with the Board's chair, Mr Bernius, in order to seek resolution without having to file suit.

I send these materials to you in order to demonstrate again my good faith, before having to regrettably and finally "pull the trigger" and file a complaint in court which should not be necessary if the bar commits to review and if necessary hold ODC to the same ethical standards that it seeks to hold other members of the bar.

In sum, it is your duty to try to head off unnecessary legal proceedings which can harm the reputation of the bar and subject it to liability , as its general counsel.

I will be in further contact in the next few days, and will hold off filing the complaint (which has already been prepared), awaiting our further communication. Until then.....

Sincerely,

Larry Klayman, Esq.
[Quoted text hidden]

**5 attachments**

**ODC Complaint (1).pdf**
24475K

**2018-06-05 Letter, Bernius to Klayman.pdf**
111K

**Supplemental Letter.pdf**
754K

**2018.06.08 - Second Supplement Letter (1).pdf**
116K

**2018.06.08 - Third Supplement Letter.pdf**
105K



KLAYMAN LAW GROUP
A PROFESSIONAL ASSOCIATION
Larry Klayman, Esq. 2020 Pennsylvania Ave. N.W., #800 Washington, DC, 20006
Tel: 310-595-0800
Fax: 202-379-9289

***Via Federal Express***

June 14, 2018 **URGENT AND FOR IMMEDIATE CONSIDERATION**

Esther Lim
President

Robert Spanoletti
Chief Executive Officer

Marlon Paz
General Counsel

District of Columbia Bar
901 4th Street, NW
Washington, DC, 20001

**Board Docket No. 17- BD-063**
**Bar Docket No. 2011-D028**
**And Other Matters**

**Re: Request for Expedited Internal Review of Unprofessional and Unethical Prosecutorial and Other Misconduct of Bar Disciplinary Counsel Hamilton Fox, Deputy Bar Disciplinary Counsels Elizabeth Herman and Julia Porter, and Assistant Bar Disciplinary Counsel H. Clay Smith III and Related Matters**

As you may know, I am the founder of both Judicial Watch and Freedom Watch and have been a member of the DC bar for 36 years, during which time, I have continuously been in good standing, and currently have no disciplinary record.

Time is of the essence, as Office of Bar Disciplinary Counsel's ("ODC") ethics violations and illegal acts set forth in the attachments hereto, which I had also sent yesterday to Marlon Paz ("Mr. Paz") the bar's general counsel via email, are continuing and getting more pronounced. Thus, as part of an apparent "cover-up by ODC and its enablers," I have been unsuccessful in even obtaining a commitment to conduct an internal review of the alleged unethical conduct, much less processing the bar grievance which I had filed.

I would prefer not to have to file suit, as I explain below to Mr. Paz, if the District of Columbia Bar and its agents will now undertake to police itself. However, the "circle the wagons" approach not only fails to live up to or adhere to the ethical standards of the bar, but also sets a bad

precedent for ordinary members of the bar – since it furthers what, in effect, is a dual system of ethics and justice.

President Esther Lim ("Ms. Lim") and CEO Robert Spanoletti ("Mr. Spanoletti"), please contact me by C.O.B this Friday, or regrettably, I will be forced to file suit if the bar continues to bury its head in the sand over its own unethical prosecutorial misconduct. Ironically, I founded Judicial Watch 24 year ago this July to serve as an ethical watchdog, in addition to the bar, over misconduct in government and the legal profession. Quite apart from my own issues concerning the unethical conduct of Bar Disciplinary Counsel, I feel strongly that the bar cannot dance to a different tune than the rest of its members. In this regard, the website of Bar Disciplinary Counsel represents that it does not just bring cases, but also was intended to protect the members of the bar from unfounded complaints and prosecutions. In short, ODC itself is not above ethics and the law.

I thus look forward to hearing from you by close of business this Friday, after you have had a chance to review the enclosed attachments, which raise serious issues of prosecutorial misconduct by ODC now as part of what thus far has been an apparent "cover-up."

Sincerely,

Larry Klayman, Esq.

cc. Hamilton Fox, Esq.
    Elizabeth Herman, Esq.
    Julia Porter, Esq.
    H. Clay Smith III Esq.
    Office of Bar Disciplinary Counsel

    Robert Bernius, Esq.
    Chair
    Board on Professional Responsibility

 **Oliver Peer <oliver.peerfw@gmail.com>**

# Ethics Complaint and Supplements

**Larry Klayman** <leklayman@gmail.com> Thu, Jun 14, 2018 at 6:31 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

Call to discuss. Thx

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Wed, Jun 13, 2018 at 9:04 PM
Subject: Fwd: Ethics Complaint and Supplements
To: Meghan Borrazas <mborrazas@dcbpr.org>
Cc: Phil Fox <FoxP@dcodc.org>, "Elizabeth A. Herman" <HermanE@dcodc.org>, "Julia L. Porter" <PorterJ@dcobc.org>, "Julia L. Porter" <porterj@dcodc.org>, Clay Smith <smithc@dcodc.org>, Frederick Sujat <fsujat@yahoo.com>, Larry Klayman <leklayman@gmail.com>

Please forward to Mr. Bernius.

Thank you Meghan.

Larry Klayman

---------- Forwarded message ---------
From: Larry Klayman <leklayman@gmail.com>
Date: Wed, Jun 13, 2018, 11:39 AM
Subject: Fwd: Ethics Complaint and Supplements
To: <espath@dcbar.org>
Cc: Phil Fox <FoxP@dcodc.org>, Elizabeth A. Herman <HermanE@dcodc.org>, Julia L. Porter <PorterJ@dcobc.org>, Julia L. Porter <porterj@dcodc.org>, Clay Smith <smithc@dcodc.org>, Frederick Sujat <fsujat@yahoo.com>, Paz, Marlon <paz@sewkis.com>

Attention: DC BAR President Esther Lim and CEO Robert Spanoletti / FOR IMMEDIATE CONSIDERATION

As I just discussed with you, thank you Mr. Spath, for forwarding this to the new DC Bar President Esther H. Lim and the DC Bar CEO Robert Spanoletti for IMMEDIATE CONSIDERATION.

As they may know, I am the founder of both Judicial Watch and Freedom Watch and a member of the DC bar for 36 years, during which time I have continuously been in good standing and currently have no disciplinary record.

Time is of the essence, as Bar Disciplinary Counsel, as set forth in the attachments which I sent yesterday to Marlon Paz (SEE BELOW EMAIL WITH ATTACHMENTS), the bar's general counsel, are continuing and getting more pronounced. Thus, as part of an apparent "cover-up" I have been unsuccessful in even obtaining a commitment to conduct an internal review of the alleged unethical conduct, much more processing bar grievance which I had filed.

I would prefer not to have to file suit, as I explain below to Mr. Paz, if the DC bar will now undertake to police itself. However, the 'this circle the wagons" approach not only fails to live up to much more adhere to the ethical standards of the bar, but also sets a bad precedent for ordinary members of the bar.

Please therefore have President Lim and CEO Spanoletti contact me by cob this Friday, or regrettably I will be forced to file suit if the bar continues to bury its head in the sand over its own unethical prosecutorial misconduct. Ironically I founded Judicial Watch 24 year ago this July to serve as an ethical watchdog, in addition to the bar, over misconduct in government and the legal profession. Quite apart from my own issues concerning the unethical conduct of Bar Disciplinary Counsel, i feel strongly that the bar cannot dance to a different tune than the rest of its members, In this regard, the website of Bar Disciplinary Counsel represents that it is not just bring cases, but also protect the members of the bar from unfounded prosecutions, much less address its own misconduct. In short, ODC itself is not above ethics and the law.

I thus look forward to hearing from the bar's President Ms.Limm and the bar's CEO Mr. Spanoletti by close of business this Friday, after they have had a chance to review the below email and attachments, which raise serious issues of prosecutorial misconduct by Bar Disciplinary Counsel.

Sincerely,

Larry Klayman, Esq.

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Tue, Jun 12, 2018 at 2:50 PM
Subject: Fwd: Ethics Complaint and Supplements
To: "Paz, Marlon" <paz@sewkis.com>
Cc: Phil Fox <FoxP@dcodc.org>, "Elizabeth A. Herman" <HermanE@dcodc.org>, "Julia L. Porter" <PorterJ@dcobc.org>, "Julia L. Porter" <porterj@dcodc.org>, Clay Smith <smithc@dcodc.org>, Frederick Sujat <fsujat@yahoo.com>, Oliver Peer <oliver.peerfw@gmail.com>

[Quoted text hidden]

---

**2018.06.08 - Third Supplement Letter.pdf**
105K

# EXHIBIT 3



**GEORGETOWN LAW**

**Abbe Smith**
Professor of Law

February 20, 2017

Office of Disciplinary Counsel
Board on Professional Responsibility
District of Columbia Court of Appeals
515 5th Street NW
Building A, Suite 117
Washington, DC 20001

To the Office of Disciplinary Counsel:

Please be advised that the below signed law professors, all of whom teach courses relating to legal ethics, are hereby filing a disciplinary complaint against District of Columbia bar member Kellyanne Conway, currently listed as a member of the bar under her name before marriage, Kellyanne E. Fitzpatrick,[1] under DC Rule of Professional Conduct 8.4(c) [hereinafter DC Rules].

As Rule 8.4(c) states, "It is professional misconduct for a lawyer to [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." This is an admittedly broad rule, as it includes conduct outside the practice of law and, unlike 8.4(b), the conduct need not be criminal. We are mindful of the Rule's breadth and aware that disciplinary proceedings under this Rule could lead to mischief and worse. Generally speaking, we do not believe that lawyers should face discipline under this Rule for public or private dishonesty or misrepresentations unless the

---

[1] Ms. Conway, née Fitzpatrick, was admitted to the DC bar on January 19, 1995 and is currently suspended for nonpayment of dues. Presumably, if she resumes payment she would be readmitted.

600 New Jersey Avenue, NW Washington, DC 20001-2075
PHONE 202-662-9579 FAX 202-662-9681
smithal@law.georgetown.edu

lawyer's conduct calls into serious question his or her "fitness for the practice of law," DC Rule 8.4, Comment 1, or indicates that the lawyer "lacks the character required for bar membership." DC Bar, Ethics Opinion 323, *Misrepresentation by an Attorney Employed by a Government Agency as Part of Official Duties*, at https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion323.cfm.

However, we believe that lawyers in public office—Ms. Conway is Counselor to the President—have a higher obligation to avoid conduct involving dishonest, fraud, deceit, or misrepresentation than other lawyers.  Although the DC Rules contain no Comment specifically relating to 8.4(c), the American Bar Association's Model Rules of Professional Conduct (MR) make this point. MR 8.4(c), Comment 7 states that "Lawyers holding public office assume legal responsibilities going beyond those of other citizens.  A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers."  *Cf*. DC Rule 1.11 (on the special conflict of interest rules for lawyers who have served in government).

It is not surprising that the Model Rules distinguish lawyers in public office from other lawyers. The ABA knows well the history of professional responsibility as an academic requirement in American law schools: following the Watergate scandal, which involved questionable conduct by a number of high-ranking lawyers in the Nixon administration, the ABA mandated that law students take such a course in order to graduate.

Some of the signers of this complaint practice in the District of Columbia and/or are members of the DC Bar.  We feel compelled to file such a complaint under DC Rule 8.3(a), which states that "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."

Those of us who do not practice in DC are members of other state and federal bars.  We all believe it is critically important that lawyers in public office—especially those who act as spokespersons for the highest levels of government—be truthful.

The DC Bar has issued an Ethics Opinion on lawyers working in government in a non-representational capacity that supports this complaint.  *See generally* Ethics Opinion 323, *Misrepresentation by an Attorney Employed by a Government Agency as Part of Official Duties*, https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion323.cfm.  In addressing an inquiry about attorneys employed by an intelligence or national security agency who engage in clandestine activities, the Opinion distinguishes those government officials whose official duties require them to "act deceitfully" from other lawyers in government.  Though the Opinion finds lawyers "whose duties require the making of misrepresentations as authorized by law as part of their official duties" do not violate Rule 8.4(c), the drafters emphasize the Opinion's narrow scope: it applies "only to misrepresentations made in the course of official conduct when the employee…reasonably believes that applicable law authorizes the misrepresentations."

Significantly, for purposes of this complaint, Ethics Opinion 323 makes plain that its conclusion in the above narrow context does not provide "*blanket permission for an attorney employed by government agencies to misrepresent themselves*." [Emphasis added] The drafters further explain:

> Nor does [the Opinion] authorize misrepresentation when a countervailing legal duty to give truthful answers applies…. And, of course, this opinion does not authorize deceit for non-official reasons, or where an attorney could not, objectively have a reasonable belief that applicable law authorizes the actions in question.

Ms. Conway's misconduct under DC Rule 8.4(c) is as follows:

- On several occasions, including in an interview on MSNBC in early February, 2017, Ms. Conway referred to the "Bowling Green Massacre" to justify President Donald Trump's executive order banning immigrants from seven overwhelmingly Muslim countries. Not only was there no "massacre" in Bowling Green, Kentucky (or Bowling Green, New York, for that matter), but Ms. Conway knew there was no massacre. Although Ms. Conway claimed it was a slip of the tongue and apologized, her actual words belie her having misspoken: "I bet it's brand-new information to people that President Obama had a six-month ban on the Iraqi refugee program after two Iraqis came here to this country, were radicalized, and were the masterminds behind the Bowling Green Massacre. Most people don't know that because it didn't get covered." *See generally* Clare Foran, *The Bowling Green Massacre that Wasn't*, THE ATLANTIC, February 3, 2017, at https://www.theatlantic.com/politics/archive/2017/02/kellyanne-conway-bowling-green-massacre-alternative-facts/515619/. Moreover, she cited the nonexistent massacre to media outlets on at least two other occasions. *See* Aaron Blake, *The Fix: Kellyanne Conway's 'Bowling Green Massacre' wasn't a slip of the tongue. She has said it before*. WASH. POST, February 6, 2017, at https://www.washingtonpost.com/news/the-fix/wp/2017/02/06/kellyanne-conways-bowling-green-massacre-wasnt-a-slip-of-the-tongue-shes-said-it-before/?utm_term=.b2de9c3f0582.

- Compounding this false statement, in that same MSNBC interview Ms. Conway also made a false statement that President Barack Obama had "banned" Iraqi refugees from coming into the United States for six months following the "Bowling Green Massacre." *Id*. However, President Obama did not impose a formal six-month ban on Iraqi refugees. He ordered enhanced screening procedures following what actually happened in Bowling Green—the arrest and prosecution of two Iraqis for attempting to send weapons and money to al-Qaeda in Iraq. The two men subsequently pled guilty to federal terrorism charges and were sentenced to substantial prison terms. *See* Glenn Kessler, *Fact Checker: Trump's facile claim that his refugee policy is similar to Obama's in 2011*, WASH. POST, January 29, 2017, at https://www.washingtonpost.com/news/fact-checker/wp/2017/01/29/trumps-facile-claim-that-his-refugee-policy-is-similar-to-obama-in-2011/?utm_term=.87f35b046de2.

- This was not the first time Ms. Conway had engaged in conduct involving "dishonesty, fraud, deceit, or misrepresentation."  On January 22, 2017, on the NBC television show *Meet the Press*, Ms. Conway said that the White House had put forth "alternative facts" to what the news media reported about the size of Mr. Trump's inauguration crowd.  She made this assertion the day after Mr. Trump and White House press secretary Sean Spicer accused the news media of reporting falsehoods about the inauguration and Mr. Trump's relationship with intelligence agencies.  *See* Nicholas Fandos, *White House Pushes 'Alternative Facts.' Here are the Real Ones.* N.Y. TIMES, January 22, 2017, at https://www.nytimes.com/2017/01/22/us/politics/president-trump-inauguration-crowd-white-house.html.  As many prominent commentators have pointed out, the phrase "alternative facts" is especially dangerous when offered by the President's counselor.  Moreover, "alternative facts' are not facts at all; they are *lies*.  Charles M. Blow, *A Lie by Any Other Name*, N.Y. TIMES, January 26, 2017, at https://www.nytimes.com/2017/01/26/opinion/a-lie-by-any-other-name.html.

- Ms. Conway has also misused her position to endorse Ivanka Trump products on February 9, 2017 in an interview on Fox News from the White House briefing room with the White House insignia visible behind her. While this conduct does not fall within DC Rule 8.4, it is a clear violation of government ethics rules, about which a *lawyer* and member of the Bar should surely know.  Federal rules on conflicts of interest specifically prohibit using public office "for the endorsement of any product, service or enterprise, or for the private gain of friends, relatives or persons with whom the employee is affiliated in a nongovernmental capacity."  The government's chief ethics watchdog denounced Conway's conduct in a letter to the White House.  Richard Perez Pena, *Ethics Watchdog Denounces Conway's Endorsement of Ivanka Trump Products*, N.Y. TIMES, February 14, 2017, at https://www.nytimes.com/2017/02/14/us/politics/Kellyanne-Conway-ivanka-trump-ethics.html.  *See also* DC Rule 1.11, Comment 2 (noting that, in addition to ethical rules, lawyers are subject to statutes and regulations concerning conflict of interest and suggesting that, given the many lawyers who work in the federal or local government in the District of Columbia, "particular heed must be paid to the federal conflict-of interest statutes.")

We do not file this complaint lightly.  In addition to being a member of the DC Bar, Ms. Conway is a graduate of the George Washington University Law School, one of the District's premier law schools.  We believe that, at one time, Ms. Conway, understood her ethical responsibilities as a lawyer and abided by them.  But she is currently acting in a way that brings shame upon the legal profession.  As the Preamble to the Model Rules states, a lawyer plays an important role as a "public citizen" in addition to our other roles.

If Ms. Conway were not a lawyer and was "only" engaging in politics, there would be few limits on her conduct outside of the political process itself. She could say and do what she wished and still call herself a politician. But she is a lawyer. And her conduct, clearly intentionally violative of the rules that regulate her professional status, cries out for sanctioning by the DC Bar.


Respectfully submitted,



John Bickers
Professor of Law
Northern Kentucky University

Susan Brooks
Professor of Law
Drexel University

Lawrence Fox
Visiting Lecturer in Law
Yale Law School


Bennett Gershman
Professor of Law
Pace University

Justin Hansford
Associate Professor of Law
Saint Louis University

Vida Johnson
Visiting Professor of Law
Georgetown University


Jennifer Kinsley
Associate Professor of Law
Northern Kentucky University

Catherine Klein
Professor of Law
Catholic University

William Montross
Visiting Professor of Law
University of the District of
Columbia


Russell Pearce
Professor of Law
Fordham University

Ilene Seidman
Professor of Law
Suffolk University

David Singleton
Associate Professor of Law
Northern Kentucky
University


Abbe Smith
Professor of Law
Georgetown University

Michael Tigar
Professor of Law Emeritus
American University
Duke University

Ellen Yaroshefsky
Professor of Law
Hofstra University