# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LARRY KLAYMAN,<br><br>            *Plaintiff*,<br><br>    v.<br><br>HAMILTON FOX, *et al.*,<br><br>            *Defendants*. | Civil Action No. 18-1579 (RDM) |

## MEMORANDUM OPINION

Plaintiff Larry Klayman, proceeding *pro se*, brings this action against the D.C. Office of Disciplinary Counsel ("ODC"), which serves as the chief prosecutor for attorney disciplinary matters involving members of the D.C. Bar, and four of its members, Hamilton Fox, Elizabeth Herman, H. Clay Smith, III, and Julia Porter. According to Plaintiff, Defendants are conspiring to disbar him or to force him to resign from the D.C. Bar (1) because they disagree with his "political beliefs [and] public interest activism" and hope to silence him and (2) because of his gender. Dkt. 10 at 2 (Amd. Compl. ¶ 1). He asks that the Court enjoin the disciplinary proceedings pending against him and award him at least $75,000 in damages. *Id.* at 25 (Amd. Compl. Prayer). The matter is before the Court on Defendants' motion to dismiss. Dkt. 15. For the reasons set forth below, the Court will grant that motion and will dismiss Plaintiff's amended complaint on the grounds that *Younger* abstention bars Plaintiff's claims for injunctive relief; the ODC is *non sui juris*; and Plaintiff's claims for damages are barred by the doctrine of absolute immunity. The Court will also grant Plaintiff's motion for leave to file a surreply. Dkt. 27.

# I. BACKGROUND

## A. District of Columbia Bar Attorney Discipline System

The D.C. Court of Appeals is authorized "to make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion." D.C. Code § 11-2501(a); *see also Nwachukwu v. Rooney*, 362 F. Supp. 2d 183, 191 (D.D.C. 2005) (quoting same). Pursuant to this authority, the D.C. Court of Appeals created the Board of Professional Responsibility ("the Board") "[t]o consider and [to] investigate any alleged ground for discipline;" to take other actions on its own initiative "to effect the purpose" of the disciplinary rules; "[t]o appoint Disciplinary Counsel, Special Disciplinary Counsel, and such assistant disciplinary counsel and staff as may be required to perform the duties and functions of that office;" "[t]o appoint . . . Hearing Committees;" "[t]o reprimand attorneys subject to the disciplinary jurisdiction of the Court and the Board;" and "[t]o adopt rules, procedures, and policies" as appropriate. D.C. Bar R. XI, § 4(e); *see also Nwachukwu*, 362 F. Supp. 2d at 192. The Board, in turn, established the ODC, formerly known as the Office of Bar Counsel, to investigate attorney misconduct and to prosecute disciplinary matters before Hearing Committees appointed by the Board, the Board itself, and the D.C. Court of Appeals. *Thomas v. Knight*, 257 F. Supp. 2d 86, 89 (D.D.C. 2003); *see also* D.C. Bar R. XI § 4(e)(2).

The attorney discipline process is structured as follows: First, the ODC investigates a complaint of attorney misconduct and decides whether to open an investigation "to ascertain if grounds exist to initiate formal proceedings." *Nwachukwu*, 362 F. Supp. 2d at 192 (noting that this decision is "well-recognized as a determination which is comparable to judicial decision-making" (quoting *Simons v. Bellinger*, 643 F.2d 744, 780 (D.C. Cir. 1980))). At the conclusion

of the investigation, the ODC may—with approval from a "Contact Member" of the Board's Hearing Committee—dismiss the complaint, issue an informal admonition, make a formal "referral of charges" to the Board, or resolve the charges by way of "diversion" or "negotiated disposition." D.C. Bar R. XI § 6(a)(3). Formal charges are prosecuted by the ODC before a Board-appointed Hearing Committee comprised of two members of the Bar and one non-lawyer. *Id.* §§ 4(e)(4), 4(e)(5), 6(a)(4). The members of the Hearing Committee have the power and duty to conduct hearings and to "submit their findings and recommendations on formal charges of misconduct to the Board." *Id.* § 5(c)(2).

Once the Hearing Committee provides a recommendation to the Board, "[e]xceptions to the report . . . may be filed in accordance with rules promulgated by the Board," and the Board must provide the attorney facing disciplinary charges and the ODC with an opportunity to submit briefs and to present oral argument. *Id.* § 9(a)–(b). The Board then either adopts or modifies the recommendation of the Hearing Committee and, unless the Board dismisses the charges or remands the case to the Hearing Committee, the Board must submit its own findings and recommendation to the D.C. Court of Appeals. *Id.* § 9(d). Both the attorney facing disciplinary changes and the ODC may, at that point, file "exceptions" to the Board's report with the D.C. Court of Appeals. *Id.* § 9(e). If the Board recommends "disbarment, suspension requiring proof of fitness as a condition of reinstatement, or suspension of one year or more without a fitness requirement," the D.C. Court of Appeals must provide the attorney facing disciplinary charges with yet another opportunity to be heard. *Id.* § 9(g) (requiring order to show cause). The D.C. Court of Appeals issues the final order, imposing disciplinary measures, if any. *Id.* § 9(h).

**B.      Ongoing Disciplinary Proceedings Against Plaintiff**

Plaintiff Larry Klayman has been a member of the D.C. Bar since 1980.  Dkt. 10 at 4

(Amd. Compl. ¶ 13).  According to the amended complaint, Plaintiff "is a prominent

conservative and non-partisan attorney and public interest activist who has brought lawsuits

against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government

officials." *Id.* at 9 (Amd. Compl. ¶ 41).  He is also the founder of "prominent public interest

watchdog groups, Judicial Watch, Inc. and Freedom Watch, Inc." *Id.*  In the last decade,

Plaintiff has been the subject of multiple complaints, resulting in the three disciplinary

proceedings at issue here.  *See* Dkt. 15-2 (Ex. 1); Dkt. 15-3 (Ex. 2); Dkt. 15-4 (Ex. 3).  The Court

may consider the official records relating to these charges, which are attached to Defendants'

motion to dismiss, without converting that motion into a motion for summary judgment because

their authenticity is undisputed, they are referenced in the amended complaint, and they are

"integral" to Plaintiff's claims.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C.

Cir. 2015); *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Dufur v. U.S. Parole

Comm'n*, 314 F. Supp.3d 10, 13 (D.D.C. 2018).  The Court does not, however, accept the truth of

any of the underlying allegations set forth in those records.

1.      *Judicial Watch Charges*

In November 2012, the ODC "submitted proposed charges against" Plaintiff relating to

his representation of three Judicial Watch employees in lawsuits against Judicial Watch.  Dkt.

15-3 at 2 (Ex. 2 ¶ 2).  The Hearing Committee determined that Plaintiff's representation of these

individuals presented a conflict of interest in violation of Rule 1.9 because he had served as

General Counsel of Judicial Watch when the events underlying the lawsuits took place.  Dkt. 15-

2 at 7 (Ex. 1).  The Hearing Committee also found that Plaintiff's conduct "seriously interfer[ed]

with the administration of justice," in violation of Rule 8.4.  *Id.* at 1 (Ex. 1).  The Hearing

Committee recommended that Plaintiff be suspended for 90 days "with readmission contingent

upon a showing of his fitness to practice law." *Id.* at 2 (Ex. 1).  The Board adopted the Hearing

Committee's findings with respect to the conflict of interest charges but "conclude[d] that

Disciplinary Counsel failed to prove the Rule 8.4(d) allegation."[1]  *Id.* at 3 (Ex. 1).  Based on the

Board's "own review of the evidence, [it] recommend[ed] that [Plaintiff] be suspended for ninety

days with no fitness requirement."  *Id.*  The matter is currently fully briefed and pending before

the D.C. Court of Appeals.

      2.    *Sataki Charges*

In July 2017, Plaintiff was charged by the ODC with violating Rules 1.2(a), 1.4(b),

1.5(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), 1.16(a)(3), and 8.4(c), arising from his

representation of Elham Sataki in a sexual harassment suit against her former employer, Voice of

America ("VOA").  Dkt. 15-4 at 2–4, 7, 11 (Ex. 3).  According to the Specification of Charges,

Plaintiff told Sataki in January 2010 that he would "represent her on a contingent fee basis

and . . . take 40% of any recovery," but he did not set forth those terms in writing.  *Id.* (Ex. 3

¶¶ 2–3).  The Specification of Charges further alleged that, after "Sataki declined [Plaintiff's]

entreaties to establish a romantic relationship," he "informed [her] that he would change the

terms . . . and require 50% of any recovery she may receive."  *Id.* (Ex. 3 ¶¶ 6–7).  Based on this

alleged conduct, the ODC charged Plaintiff with violating Rules 1.5(b) and (c) for failing to set

forth the terms of his representation in writing and Rule 1.7(b)(4) for allowing his "professional

---

[1]  Initially, Plaintiff signed an affidavit stipulating to the facts in a petition for negotiated
discipline.  After a hearing on the petition, however, the Hearing Committee rejected the
proposed disciplinary measure—public censure—as "unduly lenient."  Dkt. 15-3 at 3 (Ex. 2
¶¶ 3–4).  The matter was then referred to another Hearing Committee for further proceedings on
the charges.  *Id.* (Ex. 2 ¶ 6).

judgment on behalf of his client" to be "adversely affected by [his] own personal interests." *Id.* at 3–4 (Ex. 3 ¶ 8).

The Specification of Charges also alleged that Plaintiff failed to abide by Sataki's wishes to pursue her case "simply and quietly" and, instead, used her case to further his own personal interests in violation of Rules 1.2(a), 1.4(b), and 1.7(b)(4). *Id.* at 5–8 (Ex. 3 ¶¶ 14, 16, 22, 34). The ODC alleged that Plaintiff named numerous, unnecessary defendants in Sataki's suit, including Hillary Clinton, *id.* at 6 (Ex. 3 ¶¶ 18–19); filed a motion to have the case reassigned because the presiding judge allegedly "harbor[ed] an animus" against him "because of her association with former President . . . Clinton and former First Lady Hillary Rodham Clinton and because of certain lawsuits [Plaintiff] had filed against the Clintons," *id.* at 6–7 (Ex. 3 ¶ 21); and moved to disqualify the judge on the same ground, *id.* at 4–5 (Ex. 3 ¶ 13). After Sataki terminated Plaintiff in August 2010, *id.* at 7 (Ex. 3 ¶ 26), moreover, Plaintiff allegedly refused to withdraw from the case and continued to litigate on Sataki's behalf, in violation of the above rules as well as Rule 1.16(a)(3), *id.* at 7–8 (Ex. 3 ¶¶ 27–33).

Finally, Plaintiff was charged with violating Rules 1.2(a), 1.6(a)(1) and (3), 1.7(b)(4), and 8.4(c) for publishing eleven articles about the case in an online periodical, WorldNetDaily. *Id.* at 8–12 (Ex. 3 ¶¶ 36–48). Each article allegedly "described, in part, his representation of [Sataki] and her claims against VOA." *Id.* According to the Specification of Charges, in an article published on December 25, 2010, Plaintiff also "falsely reported that the presiding judge had 'dishonestly denied, *without factual or legal bas[is]* . . . [the] request for [Sataki] to be put back at work at the Los Angeles office [of] VOA.'" *Id.* at 11 (Ex. 3 ¶ 47) (emphasis added). With respect to each of the articles, Sataki allegedly complained that she "did not know [Plaintiff] would author" the article; that she "did not consent" to its publication; and that she was

"embarrassed by [Plaintiff's] disclosure of facts that he gained during the course of the representation." *Id.* at 9–12 (Ex. 3 ¶¶ 37–47).

The Hearing Committee conducted hearings on these charges and issued a preliminary finding that Plaintiff had violated at least one of the Rules at issue. Dkt. 15 at 13–14. Both parties then submitted post-hearing briefing addressing, among other things, the presence of any "aggravat[ing]" evidence, such as a prior disciplinary record. *Id.* at 14. The Hearing Committee has yet to submit any findings and recommendations to the Board, and Defendants note that "it is difficult to predict with any degree of accuracy when the Hearing Committee" will do so. *Id.*

3. *Bundy Charges*

Finally, in August 2018—after this case was filed—the ODC charged Plaintiff with violating Rules 3.1, 3.3(a), 8.1, 8.4(a), 8.4(c), and 8.4(d), in connection with his repeated attempts to convince the U.S. District Court for the District of Nevada to admit him *pro hac vice* to represent his client, Cliven Bundy. Dkt. 15-3 (Ex. 2). According to the Specification of Charges, the district court in the Bundy case found that Plaintiff's "statement that the matter regarding Judicial Watch" was "likely to be resolved in [his] favor" and that no disciplinary action had been taken "was 'misleading and incomplete.'" *Id.* at 6 (Ex. 2 ¶ 19). After his petition to appear *pro hac vice* was twice denied by Chief Judge Gloria Navarro of the U.S. District Court for the District of Nevada, Bundy filed a *Bivens* action against her, alleging that the denial was motivated by "political reasons." *Id.* at 8 (Ex. 2 ¶ 23). Plaintiff also filed several successive petitions for writs of mandamus with the U.S. Court of Appeals for the Ninth Circuit and with the U.S. Supreme Court, seeking orders compelling the district court to admit him and to set aside the decisions finding that he had misled the district court. *Id.* at 9–16 (Ex. 2 ¶¶ 27–52). In his fourth petition before the Ninth Circuit, Plaintiff allegedly argued that "Judge

Bybee's order" denying his previous petition to the Ninth Circuit should be vacated because of Judge Bybee's "extrajudicial bias." *Id.* at 13 (Ex. 2 ¶ 46). According to the Specification of Charges, Plaintiff's "claim that Judge Bybee had extrajudicial bias" included "a number of assertions that had no basis and were frivolous." *Id.* at 14 (Ex. 2 ¶ 47). Finally, the Specification of Charges alleges that Plaintiff also made certain misleading or incomplete representations in connection with his petitions for writs of mandamus. *Id.* at 15 (Ex. 2 ¶¶ 48–49). These charges are currently pending.[2]

## C.    Present Lawsuit

According to Plaintiff, the above charges reflect Defendants' "pattern and practice of abusing and exceeding their position of authority . . . to . . . intentionally violate [his] constitutional and other rights by selectively prosecuting [him] because of his political activism, free speech, and gender." Dkt. 10 at 38 (Amd. Compl. ¶ 39). His amended complaint asserts the following causes of action against the ODC and the individual defendants: abuse of process, malicious prosecution, and violations of the First and Fourteenth Amendments to the U.S. Constitution. *Id.* at 21–24 (Amd. Compl. ¶¶ 96–114). In support of his claims, Plaintiff primarily offers conclusory assertions. He avers, for instance,

> It is clear that Defendants' goal is to prevent Mr. Klayman from being able to practice law because they do not agree with his political and other beliefs, and in retaliation for his gender during this highly charged period when men are frequently presumed guilty of even provably false allegations.

*Id.* at 10 (Amd. Compl. ¶ 43). He further alleges:

> Because of Mr. Klayman's conservative beliefs, Defendants Herman and Porter, who are Deputy Bar Disciplinary Counsel, in particular, apparently see him as anti-woman, which is not true. It was apparent to Mr. Klayman that

---

[2] On September 24, 2018, Plaintiff filed a separate lawsuit against the ODC, its staff, and others based on these charges. *See* Dkt. 1 (Compl.), *Klayman v. Lim*, No. 18-cv-2209 (D.D.C. Sept. 24, 2018). That case is also pending before this Court.

Defendants Herman and Porter in particular wanted to take disciplinary action against him due to his gender and activism, and thus enlisted the other Defendants, including the new Bar Disciplinary Counsel, Defendant Fox, to follow suit and work in concert with them.

*Id.* (Amd. Compl. ¶ 44).

Beyond these conclusory allegations, Plaintiff also alleges the following:

*First*, in support of his claim of political bias—or propensity for political bias—he alleges that "Defendant Fox, as well as Deputy Bar Disciplinary Counsel Elizabeth Herman[,] both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats." *Id.* at 9 (Amd. Compl. ¶ 42). He further alleges, moreover, that "a group of law professors," including someone who "perhaps not coincidentally, [has] been placed on the hearing committee that is adjudicating the Sataki Complaint," filed a disciplinary complaint against Kellyanne Conway, who currently serves as Counselor to the President, "seeking to discipline her for her political activities and beliefs." *See id.* at 19–20 (Amd. Compl. ¶¶ 89–91). In Plaintiff's view, the Conway disciplinary complaint constitutes "further evidence of [the] ODC and the District of Columbia Bar's political biases and motivations to chill free speech and other constitutional rights by conservatives." *Id.* at 19 (Amd. Compl. ¶ 88). None of the signatories to that disciplinary complaint nor Kellyanne Conway, however, is a party to this case, and Plaintiff does not allege that any of the Defendants in this action had anything to do with that separate matter.

*Second*, Plaintiff alleges that the ODC has pursued the Sataki Complaint without good cause. He alleges, in particular, that the ODC "revived" the complaint eight years after the conduct at issue to "pile on . . . cases before the Board" so that he "would not be reinstated" following his suspension on the Judicial Watch charges, "effectively disbarring him," and that reviving this stale complaint constituted a "tactical" move designed to "bankrupt" him. *Id.* at

10–11 (Amd. Compl. ¶¶ 45–47).  In support of these allegations, Plaintiff attaches a letter

Defendant Smith sent to Sataki in July 2011, which states:

> Enclosed is a copy of the attorney's answer to your complaint . . . .  If we do
> not hear from you promptly, we may assume that you are satisfied with your
> attorney's explanations.

Dkt. 10-1 at 50 (July 7, 2011 Ltr.).  He also attaches an email dated January 16, 2014, from

Defendant Smith to two investigators, requesting their help to "locate" Sataki, who "ha[d]

dropped off the map."  *Id.* at 51 (Jan. 16, 2014 Email).  The email states that "[her] only

correspondence with [the ODC] was the ethical complaint" and that she never responded to the

ODC's July 7, 2011 Letter.  *Id.*  From these two communications, Plaintiff concludes that Sataki

had "abandoned" her complaint and that "Defendants, for their own unethical, unconstitutional,

illegal, and tactical reasons, outrageously and incredibly themselves resurrected [her] complaint

six years later," even though "corresponding identical complaints" with the Florida and

Pennsylvania Bar had been "summarily dismissed."  Dkt. 10 at 7 (Amd. Compl. ¶¶ 33, 35).

*Third*, Plaintiff alleges that the ODC's prosecution of the other two disciplinary charges

reflects a similar desire to subject him to disproportionate or unjustified discipline.  With respect

to the Judicial Watch charges, Plaintiff alleges that "[t]he dishonesty of the [i]ndividual

[d]efendants" is evidenced by the fact that the "ODC[] fil[ed] a frivolous assignment of error to

the Board's decision to remove" the reinstatement requirement after his recommended 90-day

suspension.  *Id.* at 11 (Amd. Compl. ¶ 48).  He further alleges that one of the ODC members,

Defendant Smith, stated that "he was relieved that the reinstatement provision was removed, as

he 'didn't think it was right,'" but that the decision "was 'out of his hands.'"  *Id.* (Amd. Compl.

¶ 50).  Plaintiff also points to the Bundy charges—although not by name—as another example of

Defendants' unlawful conduct.  *See, e.g.*, *id.* at 10–11 (Amd. Compl. ¶ 47) ("Other recent threats

of an additional bar proceeding, [were] forwarded by Defendant Porter on her own behalf and on behalf of the other Defendants, acting in concert . . . ."); *id.* at 14 (Amd. Compl. ¶ 64) ("[Defendant Porter] . . . , confirming her complicity, on multiple occasions threatened Mr. Klayman with another bar proceeding, claiming to have even prepared a draft Specification of Charges before Mr. Klayman could even respond to this threat.").

*Fourth*, Plaintiff alleges that the individual defendants allegedly displayed animus towards him at three meetings:

At the first meeting, held on July 28, 2017, Defendant Herman allegedly displayed an "extremely hostile and disrespectful demeanor" towards Plaintiff. *Id.* at 12 (Amd. Compl. ¶ 52). Plaintiff alleges that she "refused to say whether she had had contact and/or met with Ms. Sataki" and, when asked, told Plaintiff it was "none of his . . . business." *Id.* (Amd. Compl. ¶ 53). According to Plaintiff, Defendant Herman further "brazenly and openly admitted her bias and animus against [him] due to his political beliefs, activism, free speech, and gender, . . . when she curtly and in a hostile manner, on more than one occasion, stated . . . , 'I [we] don't like the way you practice law.'" *Id.* (Amd. Compl. ¶ 54). She also allegedly responded, "we couldn't care less," when Plaintiff noted that the Florida and Pennsylvania bars had dismissed Sataki's complaints. *Id.* (Amd. Compl. ¶ 56).

Plaintiff also points to his meeting with "Defendant Smith on September 29, 2017," which was held to discuss the Judicial Watch and Sataki charges. *Id.* at 13 (Amd. Compl. ¶ 57). Plaintiff alleges that Defendant Smith's conduct at this meeting "clearly demonstrated and confirmed" that Defendants have engaged in a "gender-based and political vendetta against" him. *Id.* Defendant Smith allegedly "stated that[,] if [Plaintiff] would agree to resigning, it could be done quietly . . . preventing embarrassment and bad publicity." *Id.* (Amd. Compl.

¶ 60).  According to Plaintiff, "such a strange and outrageous suggestion" was, in fact, "a warning . . . that there was a concerted effort by [Defendant Smith's] superiors at [the] ODC, including but not limited to Defendants Fox, Herman, and Porter, to remove him from the practice of law . . . ."  *Id.* at 14 (Amd. Compl. ¶ 62).

At the last meeting mentioned, held on May 11, 2018, Defendant Fox allegedly acted "in an extremely hostile manner" when he met with Plaintiff to discuss the Sataki Specification of Charges.  *Id.* at 15 (Amd. Compl. ¶ 69).  According to Plaintiff, Defendant Fox allegedly "lurch[ed] towards him and scream[ed] 'this meeting is over,'" *id.* at 16 (Amd. Compl. ¶ 72) (alterations in original); "demanded that he 'leave his office,'" *id.*; and, when Plaintiff "indicated that [Defendants'] gross prosecutorial misconduct would leave him no recourse but to file this instant Complaint" and "bar grievances," Defendant Fox purportedly responded, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law?" *id.* (Amd. Compl. ¶ 73).

*Finally*, Plaintiff avers that the ODC and the Board have engaged in misconduct and have failed to pursue disciplinary proceedings against those aligned against him.  *Id.* at 16–17 (Amd. Compl. ¶¶ 76–79).  He alleges that "Defendants purposefully and intentionally withheld exculpatory documents and evidence" regarding his disciplinary proceedings.  *Id.* at 17 (Amd. Compl. ¶ 77).  He also avers that, while the Sataki charges are moving forward, *his* complaints of misconduct against Paul Orfanedes, Judicial Watch's litigation director, and the ODC members, Dkt. 10-2 at 1, were not pursued.  *See* Dkt. 10 at 17–19 (Amd. Compl. ¶¶ 79–86).  According to Plaintiff, the failure of the Board to pursue his complaint against the ODC members is an "apparent 'cover up' to protect their own." *Id.* at 19 (Amd. Compl. ¶ 86).

Plaintiff filed suit on July 3, 2018, seeking "actual, compensatory, and punitive damages . . . in an amount no less than $75,000, as well as preliminary and permanent injunctive relief." *Id.* at 25 (Amd. Compl. Prayer). Defendants' motion to dismiss, Dkt. 15, and Plaintiff's motion for leave to file a surreply, Dkt. 27, are pending before the Court.

## II. LEGAL STANDARD

Defendants move to dismiss the case on two grounds: lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and failure to state a claim, Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(1) motion to dismiss, "[t]he party invoking federal jurisdiction bears the burden of establishing" jursidiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Court may dismiss the complaint if the plaintiff fails to plead facts sufficient to establish that the Court has jurisdiction but, "where necessary, the court may [also] consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 71 (D.D.C. 2019). Thus, the Court may look beyond the allegations of the complaint to the extent necessary to satisfy itself that it has jurisdiction to hear the suit.

A motion to dismiss brought under Rule 12(b)(6), in contrast, is designed to "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (internal citation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). Although "detailed factual allegations" are not necessary to withstand a Rule

12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must

contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible

on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## III.  ANALYSIS

Defendants' arguments are three-fold.  *First*, they contend that the Court should dismiss

Plaintiff's claims for injunctive relief under *Younger v. Harris*, 401 U.S. 37 (1971).  Dkt. 15 at

19–23.  *Second*, they assert that neither the ODC nor its staff members are subject to suit for

damages: the ODC because it is *non sui juris*, and its members because they are absolutely

immune from suit for performing their officials duties.  *Id.* at 23–25.  *Third*, and finally,

Defendants argue that, even if the Court were to reach the merits of Plaintiff's case, the amended

complaint fails to state a claim.  *Id.* at 26–30.  Because resolution of the first two arguments is

sufficient to dispose of Plaintiff's claims, the Court will cabin its analysis accordingly.

### A.      *Younger* **Abstention**

The Supreme Court has long held that "*Younger v. Harris* [401 U.S. 37 (1971)] and its

progeny espouse a strong federal policy against federal-court interference with pending state

judicial proceedings absent extraordinary circumstances."  *Middlesex Cty. Ethics Comm. v.

Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  "The policies underlying *Younger* are fully

applicable to noncriminal judicial proceedings when important state interests are involved."  *Id.*

at 432 (citing *Moore v. Sims*, 442 U.S. 415, 423 (1979); *Huffman v. Pursue, Ltd*., 420 U.S. 592,

604–05 (1975)).  Those policies and the *Younger* doctrine itself, moreover, apply to enforcement

proceedings pending in the District of Columbia; they do so because "Congress' intent" in

enacting the District of Columbia Court Reorganization Act of 1970, Pub. L. No. 91-358, § 111,

84 Stat. 473, 475–521 (1970), "was to give the District 'a court system comparable to those of

the states,' H.R. Rep. No. 91-907, at 23," and to place this Court "on a par with other United States District Courts" in its relationship with the local courts. *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1120–25 (D.C. Cir. 2004).

Plaintiff argues that *Younger* abstention is inapplicable to his claims for injunctive relief for two reasons, neither of which is persuasive:

*First*, Plaintiff argues that the Supreme Court "narrow[ed] [the] scope of the *Younger* doctrine" in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), and that, as refined in that decision, the doctrine applies only to "ongoing state criminal prosecutions," "certain 'civil enforcement proceedings,'" and "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state court's ability to perform their judicial functions.'" Dkt. 25 at 16 (quoting *Sprint Commc'ns, Inc.*, 571 U.S. at 73, 78 (citations omitted)). Putting aside the question whether *Sprint Communications* "narrowed" or merely reflected the Court's prior *Younger* abstention decisions, Plaintiff correctly describes the "three 'exceptional' categories" to which *Younger* abstention applies, and, indeed, the *Sprint Communications* decision made explicit that these categories "define *Younger*'s scope" in full. 571 U.S. at 78. That, however, is as far as Plaintiff's argument takes him because the attorney disciplinary proceedings that he seeks to enjoin fall squarely within the "scope of the *Younger* doctrine," as explicated in *Sprint Communications* and other binding Supreme Court precedents.

In identifying the type of "civil enforcement" proceedings to which *Younger* extends, the *Sprint Communications* decision pointed to the Supreme Court's earlier decision in *Middlesex*, 457 U.S. 423 (1982), which, like this case, involved a suit seeking to enjoin an attorney disciplinary proceeding pending under the auspices of the state's highest court. In *Middlesex*, as here, an attorney was charged with misconduct pursuant to the state bar disciplinary procedures,

and he sought to enjoin that proceeding as violative of his First Amendment rights. *Id.* at 428–29. There, as here, the defendants invoked *Younger* abstention as a basis to dismiss the action. *Id.* at 429. And the Supreme Court agreed that *Younger* applied, holding that the state had "an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses" and that "[t]he importance of the state interest in the pending state judicial proceedings . . . call[ed] *Younger* abstention into play." *Id.* at 434–35. As the Court explained: "So long as the constitutional claims of respondents can be determined in the state proceedings and so long as there is no showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate, the federal courts should abstain." *Id.* at 435. In other words, the principle that *Younger* abstention applies to attorney disciplinary proceedings not only survived the Court's decision in *Sprint Communications*, it was expressly reaffirmed. *See* 571 U.S. at 79 ("*Younger* abstention [is] appropriate where 'noncriminal proceedings bear a close relationship to proceedings criminal in nature'" (quoting *Middlesex*, 457 U.S. at 432)); *id.* (identifying "state-initiated disciplinary proceedings against lawyer for violation of state ethics rules" as an example of the type of action subject to *Younger* abstention) (citing *Middlesex*, 457 U.S. at 433–34)). The Court, therefore, concludes that the attorney disciplinary proceedings at issue in this case implicate *Younger* and its progeny.

*Second*, Plaintiff argues that the bad-faith exception to *Younger* abstention precludes application of the doctrine to his claims for injunctive relief. Even prior to *Younger*, the Supreme Court recognized an exception to the limitation on federal judicial authority to enjoin certain state court proceedings, if those proceedings were initiated in bad faith. Most notably, in *Dombrowski v. Pfister*, 380 U.S. 479 (1965), the Supreme Court reversed the decision of a three-judge court to abstain from addressing the constitutionality of a criminal statute pending the

"state prosecution and possible review . . . of [an] adverse state determination." *Id.* at 483, 497–98. The Court's decision was premised, in part, on the plaintiffs' allegations that the state officials in that case sought to enforce the statute in bad faith, "without any hope of ultimate success, but only to discourage [the plaintiffs'] civil rights activities." *Id.* at 490; *see also id*. at 482 (noting the complaint alleged "that the threats to enforce the statutes [were] not made with any expectation of securing valid convictions, but rather as part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass" plaintiffs). Returning to this theme in *Younger*, the Supreme Court recognized an exception to the abstention doctrine in cases involving "bad faith" or "harassment," 401 U.S. at 54—that is, where the complaint contains "substantial allegations" that a threat of enforcement has been made without "'any expectation of securing valid convictions, but rather [as] part of a plan . . . to harass'" the plaintiff, 401 U.S. at 48 (quoting *Dombrowski*, 380 U.S. at 482).

Beyond confirming that the exception is a "narrow" one, the Supreme Court's post-*Younger* decisions "have not shed a great deal of additional light" on what constitutes bad faith. 17B Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 4255 (3d ed. Apr. 2019 update) [hereinafter "Wright & Miller"]. One decision, however, provides some guidance on the scope of the exception and how it applies in the present context. In *Kugler v. Helfant*, 421 U.S. 117 (1975), the plaintiff, a municipal court judge and member of the state bar, filed suit in federal court to enjoin the New Jersey Attorney General and other state officials from proceeding with an indictment against him. He alleged that the Chief Justice and other members of the New Jersey Supreme Court coerced him into waiving his Fifth Amendment right not to testify in front of a state grand jury out of fear that he would lose his judgeship and bar membership. *Id.* at 121. The plaintiff was subsequently indicted for obstruction of justice and

"false swearing" and sought to enjoin his prosecution. *Id.* In his civil action, Kugler alleged that

the prosecution and members of the State Supreme Court engaged in "prejudicial collusion" to

deprive him of his constitutional rights and that, in light of their conduct, he would be unable to

obtain a fair trial. *Id.* at 122. The district court dismissed the complaint and, after an intervening

appeal to the Third Circuit, the Supreme Court agreed that *Younger* abstention barred Kugler's

claims. *Id.* at 119–20, 126.

Of significance for present purposes, the Supreme Court upheld the dismissal of the

complaint under Federal Rule of Civil Procedure 12(b)(6); it evaluated whether the bad-faith

exception was available based on the allegations contained in the complaint, without relying on a

factual hearing, and it held that the bad-faith exception did not apply, notwithstanding the

plaintiff's conclusory allegations of "prejudicial collusion" and "bad faith." *Id.* at 122–26 & n.5.

As the Supreme Court explained, even though the complaint contained the allegation that "the

collusive actions of members of the State Supreme Court and the Deputy Attorney General

demonstrat[ed] prosecutorial bad faith warranting federal intervention," more was required to

avoid *Younger* abstention. *Id.* at 126 n.6. "Bad faith" requires allegations sufficient to show that

the prosecution was brought for purposes of harassment or intimidation, "without a reasonable

expectation of obtaining a valid conviction." *Id.* To meet this burden, a plaintiff seeking to

invoke the bad-faith exception must "allege *specific facts* to support an inference of bad faith."

*Arkebauer v. Kiley*, 985 F.2d 1351, 1359 (7th Cir. 1993) (emphasis added) (citation omitted).

Under current pleading standards, this means that a plaintiff must allege facts that, if

accepted as true, set forth a claim of bad faith "that is plausible on its face." *Twombly*, 550 U.S.

at 570. In other words, a plaintiff must allege "factual content" sufficient to "allow[] the court to

draw the reasonable inference that the defendant" is subject to suit in federal court, *Iqbal*, 556

U.S. at 678, notwithstanding *Younger* and its progeny. When assessing the plaintiff's complaint, moreover, the Court must identify legal conclusions "couched as . . . factual allegation[s]," *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), and must "decline to extend the presumption of truth to such conclusory allegations," *Tracy v. United States*, No. 16-cv-651, 2016 WL 76664716, at *4 (D.D.C. Nov. 18, 2016) (citing *Iqbal*, 556 U.S. at 678). Given this demanding standard, it is not surprising that there has been "no case since *Younger* was decided in which the [Supreme] Court . . . [has] found that the exception for bad faith or harassment was applicable" and that "[l]itigants who have sought to bring themselves within the exceptions to *Younger* have had almost as little success in the lower courts." Wright & Miller, *Federal Practice and Procedure* § 4255.

Plaintiff does not take issue with the premise that the Court must assess whether he has alleged an adequate factual basis for invoking the bad-faith exception but, rather, argues that the allegations set forth in his complaint satisfy that standard. Dkt. 25 at 17–19. The Court disagrees. The "crux" of Plaintiff's claim of bad faith is that Defendants are pursuing disciplinary charges against him because they disagree with his political beliefs and "conservative public advocacy" and because of his gender. *See* Dkt. 25 at 18. But putting aside Plaintiff's conclusory assertions, as the Court must, *see Twombly*, 550 U.S. at 555, his amended complaint fails to allege facts sufficient to invoke the bad-faith exception.

Liberally construed, Plaintiff's claim of political motivation rests on five sets of factual allegations: *First*, that Plaintiff has "brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials;" "conceived and founded . . . Judicial Watch, Inc. and Freedom Watch, Inc.;" and "r[an] for the U.S. Senate in the Florida Primary." Dkt. 10 at 9 (Am. Compl. ¶ 41). *Second*, that two of the four individual

defendants "donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats." *Id.* (Am. Compl. ¶ 42). *Third*, that one of the members of "the hearing committee that is adjudicating the Sataki Complaint" signed a complaint "seeking to discipline" Kellyanne Conway "for her political beliefs" and "to . . . chill[] . . . free speech on behalf of President Donald J. Trump." *Id.* 19–20 (Am. Compl. ¶¶ 89-92). *Fourth*, that one of the individual defendants allegedly has a conflict of interest, unrelated to any political activity, *id.* at 15 (Am. Compl. ¶ 68), and acted in a hostile manner towards Plaintiff at a meeting, *id.* at 15–16 (Am. Compl. ¶¶ 69–75); another individual defendant acted in a "hostile" manner and with a "disrespectful demeanor" towards Plaintiff, *id.* at 12 (Am. Compl. ¶¶ 52–56); and yet another individual defendant suggested that Plaintiff resign from the bar to avoid "embarrassment and bad publicity," *id.* at 13–14 (Am. Compl. ¶¶ 60–61). *Finally*, that, in Plaintiff's view, the Sataki Complaint is "clearly non-meritorious," as evidenced by the fact that the Florida and Pennsylvania Bars summarily rejected the same charges. *Id.* at 17 (Am. Compl. ¶ 80).

The Courts of Appeals are divided on the question whether the bad-faith exception to *Younger* applies to *any* prosecution brought in retaliation for (or to deter) constitutionally protected activity, or to *only* those prosecutions brought without a reasonable expectation of obtaining a conviction. *Compare Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988), *and Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir. 1994), *with In re Kunstler*, 914 F.2d 505, 517 (4th Cir. 1990). Under either line of precedents, however, Plaintiff's allegations of political bias are insufficient to overcome *Younger* abstention. Indeed, if courts were to permit claims for injunctive relief to proceed on such reedy allegations, *Younger* would lose much of its force. Those facing prosecution in state court, for example, could use a federal forum to intrude on those proceedings based on little more than their known political affiliation, a past political

contribution to a candidate from a different political party by a member of the prosecution team, and conclusory allegations that the prosecution is not well-founded. That would flip the presumption of good faith in the discharge of governmental authority on its head, *China Trade Ctr., LLC v. Wash. Metro. Area Transit Auth.*, 34 F. Supp. 2d 67, 70-71 (D.D.C. 1999), *aff'd*, No. 99-7029, 1999 WL 615078 (D.C. Cir. 1999) (per curiam), leaving the public with the misguided impression that those trusted to act in the public interest are—invariably—incapable of separating their past personal political views from their existing official responsibilities. Nothing in the principles of equity on which *Younger* is premised or in existing precedent invites such a pernicious result. Plaintiff's allegations that a law professor who is a member of the Sataki Hearing Committee signed a complaint against Kellyanne Conway or that the individual defendants had acted in a "hostile" manner toward him, Dkt. 10 at 12, 15, 16 (Amd. Compl. ¶¶ 52–54, 69, 74), moreover, add no meaningful substance to his claim of bad faith. The law professor is not a defendant in this action; this case is not about the merit, or lack of merit, of the Conway complaint; and, even if the law professor's objectivity were at issue in this proceeding, Plaintiff's amended complaint alleges *prosecutorial* abuse, not bias by the Hearing Committee. Likewise, although one would hope that prosecutors would always avoid displays of disrespect and "hostility," expressions of annoyance, frustration, and even anger are not enough to open the door to a federal court's interference in a state court proceeding.

Plaintiff's theory of gender bias is even more tenuous. He merely alleges that the two female ODC members "apparently see him as anti-woman" and "apparent[ly] . . . wanted to take disciplinary action against him due to his gender and activism." Dkt. 10 at 10 (Am. Compl. ¶ 44). But he fails to offer a single non-conclusory allegation in support of that assertion. The one relevant allegation that he does make, moreover, contains a puzzling addition: He alleges

that "Herman abruptly and in a hostile voice refused to say whether she had had contact with and/or met with Ms. Sataki" and that "this was 'none of his [male] business.'"  Dkt. 10 at 12 (Am. Compl. ¶ 53).  It is unclear what Plaintiff intends the bracketed reference to his gender to mean.  If he simply means to emphasize that Herman said that whether she had contacted Sataki was none of "his" business, that allegation adds nothing.  But, if he means to convey more than this—for example, if Herman had used a synonym for "male" that he was not inclined to repeat—the complaint fails to offer any insight regarding what he claims actually occurred.  In any event, it is safe to say that Plaintiff's amended complaint would not come close to satisfying pleading requirements in a gender-based employment discrimination case, *see Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (discussing standard for alleging prima facie case of disparate treatment), and, for the same reason, it does not come close to alleging facts sufficient to invoke the bad-faith exception to *Younger*.

The only remaining possibility is that Plaintiff seeks to allege that Defendants initiated charges against him "without a reasonable expectation of obtaining a valid conviction" and have, instead, brought disciplinary charges merely to harass him, as contemplated by *Kugler*, 421 U.S. at 124.  With minor exception, Plaintiff's allegations are, once again, too conclusory to invoke the bad-faith exception under this theory.  All that Plaintiff alleges with specificity is that two other jurisdictions "summarily dismissed" complaints that were "identical" to the Sataki Complaint and that one of the individual defendants told Plaintiff "that he was relieved that the reinstatement provision" included in an earlier resolution of the Judicial Watch Complaint "was removed," because he "didn't think it was right."  Dkt. 10 at 7, 11 (Amd. Compl. ¶¶ 33, 50).  These allegations of bad faith, however, fail for at least three reasons: (1) the initial charges were based on a third-party complaint, Dkt. 15-4 (Ex. 3); (2) the charges were instituted only after a

"contact" member of the Hearing Committee—an individual who is independent from the ODC and not a defendant in this case—approved them; *see* D.C. Bar R. XI § 6(a)(3); and (3) the Hearing Committee conducted hearings on the charges and issued a preliminary finding that Plaintiff had violated at least one of the Rules of Professional Conduct at issue, *see* Dkt. 15 at 13–14.  There is no basis for the Court to hold that the ODC is proceeding without a reasonable expectation of obtaining relief when the Hearing Committee has already concluded otherwise. Similarly, even assuming that one of the individual defendants indicated that he thought the remedy the ODC sought for the Judicial Watch charges was too harsh, that fact, alone, does not establish bad faith or that the ODC did not reasonably expect the Board to agree with its position.

It bears emphasis, yet again, that the bad-faith exception is a "narrow" one, *Huffman*, 420 U.S. at 611–12, and that, if accepted, Plaintiff's theories would allow the exception to swallow the rule.  It is not this Court's role to decide whether the disciplinary charges pending against Plaintiff are well-founded or whether Plaintiff is likely to ultimately prevail.  The question is not whether other state bars have declined to pursue similar charges or whether everyone on the ODC team agrees with each decision the office has made.  The only issue before this Court is whether Plaintiff has alleged specific facts that, if accepted as true, plausibly show that the ODC is proceeding without a reasonable expectation of success.  Plaintiff has failed to satisfy that burden.

The Court, accordingly, concludes that Plaintiff has failed to allege sufficient facts to support an application of the bad-faith exception.

## B.    Judicial Immunity

Plaintiff is correct, however, that application of *Younger* does not necessarily resolve his claims for damages.  *See J.M.M. Corp. v. District of Columbia*, 253 F. Supp. 2d 15, 16, 18–19

(D.D.C. 2003) (applying *Younger* to dismiss plaintiff's claims for declaratory and equitable relief but staying its claim for damages under § 1983). Nevertheless, as further explained below, the Court will also dismiss Plaintiff's damages claims on the grounds that (1) the ODC is not subject to suit, and (2) the individual defendants are entitled to absolute immunity.

1.    *Claims Against the ODC*

As a threshold matter, the ODC, an instrumentality of the D.C. Court of Appeals, is not subject to suit. "[T]he overwhelming weight of precedent in this Circuit . . . holds that[,] in the absence of *explicit* statutory authorization, bodies within the District of Columbia government are not suable as separate entities." *Newman v. District of Columbia Courts*, 125 F. Supp. 3d 95, 102–03 (D.D.C. 2015) (alterations in original) (quoting *Kundrat v. District of Columbia*, 106 F. Supp. 2d 1, 7 (D.D.C. 2000)); *see also Hoai v. Superior Court of the District of Columbia*, 539 F. Supp. 2d 432, 435 (D.D.C. 2008) ("[N]aming the D.C. courts, and their components, as defendants does not save plaintiffs' claims because those entities are *non sui juris*."). Plaintiff has failed to identify any "explicit statutory authorization" that would subject the ODC to suit, nor is the Court aware of any. In fact, Plaintiff fails to offer any response to the ODC's argument and has, accordingly, conceded the point. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002).

The Court will therefore dismiss Plaintiff's damages claims against the ODC.

2.    *Claims Against the Individual Defendants*

The legal precedent is equally clear that judicial immunity shields the individual defendants from liability for carrying out their official duty: prosecuting attorney misconduct

charges on behalf of the D.C. Court of Appeals, *see* D.C. Bar R. XI § 6(a)(4).[3] Since "[a]s early as 1872," the Supreme Court has recognized that, "a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions." *Stump v. Sparkman*, 435 U.S. 349, 355 (1978) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). The Supreme Court has, accordingly, exempted judges from civil suit for their judicial acts, "even when such acts [were] in excess of their jurisdiction, and [were] alleged to have been done maliciously or corruptly." *Stump*, 435 U.S. at 356 (quoting *Bradley*, 80 U.S. at 351). In *Stump*, for example, the Court held that a state court judge was entitled to absolute immunity against suit for approving a parent's petition to have her child sterilized. *Id.* at 351, 355, 359. Although acknowledging the "tragic consequences" of the judge's actions, *id.* at 363, the Court explained that absolute judicial immunity applied because the judge had subject-matter jurisdiction to consider the petition, *see id.* at 357–58, and because his act of approving a petition was a "judicial" act, *see id.* at 360–63.

Over the years, courts have extended this immunity to other officials performing "quasi-judicial functions" if two conditions are met: (1) "the act must not have been taken in 'the clear absence of jurisdiction;'" and (2) "the act must be a judicial act." *Nwachukwu*, 362 F. Supp. 2d at 192 (citations omitted); *see also Butz v. Economou*, 438 U.S. 478, 512–13 (1978) (extending

---

[3] Although not binding for purposes of Plaintiff's federal claims, the D.C. Bar Rules expressly confer the ODC members immunity from suit for acts carried out in their official capacity:

> Members of the Board, its employees, members of Hearing Committees, Disciplinary Counsel, and all assistants and employees of Disciplinary Counsel, all persons engaged in counseling, evaluating or monitoring other attorneys pursuant to a Board or Court order or a diversion agreement, and all assistants or employees of persons engaged in such counseling, evaluating or monitoring *shall be immune from disciplinary complaint under this rule and from civil suit for any conduct in the course of their official duties*.

D.C. Bar R. XI, § 19(a) (emphasis added).

immunity to participants in agency administrative adjudication).  Consistent with *Butz*, the D.C.

Circuit held in *Simons v. Bellinger*, 643 F.2d 774 (D.C. Cir. 1980), that D.C. Bar disciplinary

proceedings are judicial proceedings and that officials who participate in those proceedings are

engaged in judicial acts that are entitled to absolute immunity.  *See id.* at 779–82.  As the D.C.

Circuit explained in *Simons*, members of a committee "empowered to investigate and prosecute"

charges of unauthorized practice of law were entitled to absolute immunity because the

committee members "serve[d] as an arm of the court and perform[ed] a function which

traditionally belongs to the judiciary"—in other words, "[the committee members'] efforts to

ascertain those practicing law without proper authority [were] judicial efforts."  *Id.* at 780.  Of

particular concern to the D.C. Circuit was also the fact that, "[l]ike judges and prosecutors,"

officials involved in bar discipline "are probable targets for harassing lawsuits."  *Id.* at 782.

Since *Simons* was decided, this Court has repeatedly upheld disciplinary counsels' absolute

immunity from suit in situations similar to the case at bar.  *See, e.g.*, *Rodriguez v. Shulman*, 844

F. Supp. 2d 1, 11–12 (D.D.C. 2012); *Richardson v. District of Columbia*, 711 F. Supp. 2d 115,

128 (D.D.C. 2010); *Nwachukwu*, 362 F. Supp. 2d at 192–93; *Thomas v. Knight*, 257 F. Supp. 2d

86, 94 (D.D.C. 2003).

   In light of the above, the Court concludes that the ODC members are entitled to absolute

immunity for their conduct in the ongoing disciplinary proceedings.  Plaintiff cannot plausibly

argue—given the long line of precedent and D.C. Bar Rules expressly authorizing the ODC to

institute disciplinary charges—that the prosecution against him exceeded the ODC's jurisdiction

or that it did not constitute a judicial act.  The fact that Plaintiff sued the ODC members in their

individual capacities, moreover, is of no import because all of his allegations relate to the

conduct they engaged in during the course of their official duties.  This Court has time and again

rejected such an attempted end-run around absolute immunity. *See Richardson*, 711 F. Supp. 2d at 128 (granting bar officials absolute immunity even though plaintiff sought "relief against the defendants . . . '*individually* or in their representative capacities'"); *see also Nwachukwu*, 362 F. Supp. 2d at 192; *Thomas*, 257 F. Supp. 2d at 88 n.2.

Plaintiff's only rejoinder is that the individual defendants in this case exceeded the scope of their official duties. *See* Dkt. 10 at 8 (Amd. Compl. ¶ 39) (stating that Defendants engaged in a "pattern and practice of abusing and exceeding their position of authority" to intentionally violate his rights). But Plaintiff offers no factual allegations to support this conclusory assertion. He merely argues that the individual defendants were acting beyond the scope of their official duties because "[he] has not engaged in any unethical conduct." Dkt. 25 at 21. The fact that "plaintiff disagrees with the defendants' conclusion" that he engaged in misconduct, however, "does not strip the defendants' privilege of immunity." *Nwachukwu*, 362 F. Supp. 2d at 193. Otherwise, disciplinary counsel would be subject to suit every time an attorney alleges that he was wrongfully charged. That cannot be right. *Cf. Briggs v. Goodwin*, 569 F.2d 10, 15 (D.C. Cir. 1977) (The argument that "any allegation that an official, acting under color of law, has deprived someone of his rights necessarily implies that . . . the official exceeded his authority . . . would completely abrogate the doctrine of immunity.").

The two cases Plaintiff cites offer no support to the contrary. In *Fields v. Wharrie*, 740 F.3d 1107, 1113–14 (7th Cir. 2014), the Seventh Circuit held that an Illinois prosecutor who fabricated evidence "pre-prosecution as an investigator" and later introduced that evidence at trial was not entitled to absolute prosecutorial immunity. The court reasoned that "[a] prosecutor may not shield his *investigative* work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as

'preparation' for a possible trial." *Id.* (emphasis added). *Fields* is inapposite here. This case concerns judicial, not prosecutorial, immunity, and the crux of Plaintiff's complaint is not that he has been subject to an investigation—it is that he has been unfairly charged with disciplinary violations. The second case Plaintiff cites, *Keller v. State Bar of California*, 496 U.S. 1 (1990), is even less on point. There, the Supreme Court held that the California Bar's use of compulsory dues to finance political and ideological activities with which members disagreed violated their First Amendment right to free speech when such expenditures were not for the purpose of regulating the legal profession or improving the quality of services. *Id.* at 15–16. *Keller* makes no mention of judicial immunity from suit for damages.

The Court will, accordingly, dismiss Plaintiff's damages claims against the individual defendants as barred by absolute immunity.

## C.     Plaintiff's Motion for Leave to File Surreply

One final issue remains: Plaintiff filed a motion for leave to file a surreply, Dkt. 27, which Defendants opposes, Dkt. 28. "[S]urreplies are generally disfavored," and the determination as to "whether to grant or deny leave is entrusted to the sound discretion" of the Court." *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012). It is well-established that the purpose of a surreply is to "enable the nonmovant to contest matters presented for the first time in the opposing party's reply." *Nix El v. Williams*, 174 F. Supp. 3d 87, 92 (D.D.C. 2016). Here, Plaintiff's proposed surreply goes beyond that limited purpose. Before deciding to dismiss Plaintiff's amended complaint, however, the Court—out of an abundance of caution and as an exercise of its discretion—reviewed Plaintiff's surreply to ensure that the Court was fully informed of Plaintiff's contentions. Because that review did not give Plaintiff an unfair advantage, and, indeed, merely confirmed the Court's understanding of the

limited scope of the contentions Plaintiff has made, the Court will grant Plaintiff's motion for leave to file a surreply.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion to dismiss, Dkt. 15, and will dismiss the amended complaint without prejudice. *See Attias v. Carefirst, Inc.*, 865 F.3d 620, 623–24 (D.C. Cir. 2017). The Court will also **GRANT** Plaintiff's motion for leave to file a surreply, Dkt. 27.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: June 5, 2019